Francine GOLDSTEIN and Allan Goldstein, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 95–CV–3950 (JS).

United States District Court,
E.D. New York.

June 22, 1998.

Ben Rubinowitz, Gair, Gair, Conason, Steigman & Mackauf, New York City, for Plaintiffs.

Zachary W. Carter, U.S. Attorney by Linda Marino, Charles P. Kelly, Asst. U.S. Attorneys, Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

This is an action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), to recover damages for personal injuries suffered by the plaintiff, Francine Goldstein, in a vehicular accident which occurred on October 1, 1994.[1] This decision

---

1. This action was timely commenced against the United States of America ("Government") and Richard J. Esopa, the driver of the vehicle plain-tiff occupied, however prior to trial, the plaintiffs discontinued with prejudice their action against Mr. Esopa, and the Government and Mr. Esopa

follows a bench trial conducted by this Court On October 27, 1997 through October 31, 1997, and after receipt of numerous post-trial submissions on the issue of damages. Upon the evidence presented and the arguments submitted, the Court renders a verdict in favor of the plaintiffs based upon the findings of fact and the conclusions of law stated below,[2] as required by Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. *Liability*

1. On October 1, 1994, at approximately 1:00 p.m., Mrs. Goldstein was sitting in the right rear passenger seat of a 1985 Buick Le Sabre operated by Richard Esopa. The vehicle was also occupied by Karen Fitz in the front passenger seat. (Tr. at 24–26).[3]

2. Ms. Fitz and Mr. Esopa were friends of Mrs. Goldstein and they were all on their way to attend an evening wedding in Tarrytown, New York, when the accident occurred. (Tr. at 26, 76–77).

3. Mr. Esopa's Buick was evidently in excellent condition prior to the accident. (Tr. at 25, 77).

4. Immediately prior to the accident, Mr. Esopa was proceeding westbound in the left lane on the Long Island Expressway ("Expressway"), in the vicinity of Old Westbury, New York. The Expressway has three lanes in each direction separated by a cement median barrier. (Tr. at 27–29, 225–31; Pls.' Ex. 3–A, 3–B and 3–C).

5. It was a rainy Saturday afternoon, traffic was moderate and the roadway was wet, but there was no flooding or heavy fog. (Tr. at 27, 29, 77–79, 227–28, 358, 373).

6. The defendant's vehicles included three five ton United States Army tractor-trailer trucks. Specifically, the trucks are denominated "fifth wheel" Model 931–A–2 type, with attached trailers which were carrying laundry equipment. These vehicles were traveling parallel to, and about the same rate of speed as, the Esopa vehicle. (Tr. at 79–82, 93–99, 360).

7. The Army trucks were returning to Fort Totten, Queens, and were traveling westbound in the far right lane in the following order: (1) a truck operated by Specialist Perez (the "Perez truck") with assistant driver PSC Ramos seated in the front passenger seat; (2) a truck operated by Specialist Pedican (the "Pedican truck") with Private Inglis seated in the middle between Pedican and assistant driver Specialist Bullock in the front seat; and (3) a truck operated by Sergeant Rivera (the "Rivera truck") with Specialist Rigel seated in the front seat. (Tr. at 79, 289–91, 413, 414).

8. The Pedican truck was approximately two to three car lengths in front of the Rivera truck and both trucks were traveling approximately 40 m.p.h. (Tr. at 60–62, 79–81, 361; Rigel Dep. at 64).

9. When Pedican observed a privately owned vehicle ("POV") on the right shoulder of the roadway, Perez's vehicle was not in view. (Tr. at 325).

10. Pedican realized that the privately owned vehicle, which resembled a Blazer S–10, was trying to access the right lane and merge into Pedican's lane of traffic. Pedican saw at least two civilian vehicles directly in front of his truck refuse to slow down and allow the POV entry onto the Expressway. (Tr. at 291–92, 328–36).

11. Although the distance between the Pedican truck and the POV is uncer-

---

discontinued with prejudice their cross claims against each other. Therefore, the issue of comparative negligence is not before the Court.

**2.** To the extent that a finding of fact constitutes a conclusion of law, it is adopted as such, and to the extent that a conclusion of law constitutes a finding of fact, it is likewise adopted as such.

**3.** All references to the trial transcript are designated "Tr." other references are designated by the witness' name and deposition citation, the party's document or trial exhibit designation.

tain and open to debate, Pedican had sufficient time to honk his horn once and flash his lights twice before braking. The Pedican truck never struck the POV. (Tr. at 328–31, 338–41).

12. The POV accelerated onto the Expressway in front of Pedican's truck, requiring Pedican to slam on his brakes, causing the trailer brake to lock and the trailer to skid. The tractor skidded to the right towards the shoulder and then turned 180 degrees to the left and skidded across three lanes of traffic while the trailer jackknifed and eventually came to rest on the shoulder on the right side of the Expressway. (Tr. at 292–94, 348, 441).

13. Pedican's truck skidded because he slammed on the brakes instead of decelerating by taking his foot off of the gas pedal. He may have also confused the operator of the POV by flashing his lights, leading the operator of the POV to infer that Pedican was allowing him to enter onto the Expressway. (Tr. at 291–94, 348–49, 363, 441).

14. Inexplicably, Pedican claims for the first time at trial that he may have hit a limousine during this accident. (Tr. 293, 299–304, 348). Neither the limousine nor the POV were ever located and the respective operators of these vehicles were never identified by the Government. The Court concludes that Pedican's statement regarding another possible collision is troubling in assessing his credibility.

15. Rivera was driving approximately 40 miles per hour and was less than one to two car lengths behind the Pedican truck immediately prior to the POV entering the traffic lane. In light of the existing traffic and weather conditions, Rivera was proceeding too fast and was positioned too close to the Pedican truck. When Rivera observed the POV cut in front of the Pedican truck, Rivera took his foot off the gas pedal, but to his dismay and surprise, he observed that Pedican's truck had turned around and was coming towards him. Rivera pumped the brake but his truck began to slide and he then applied the "Jake brake."[4] Once the Jake brake was applied the trailer "really whipped around" and Rivera's truck traveled across three lanes of traffic striking the median divider on the right front side of the truck. (Tr. at 363–65). It also struck or caused Esopa's vehicle to wind up on the back of, or under, the trailer of Rivera's truck. (Tr. at 239; Rigel Dep. 80–82).

16. The Pedican truck caused the Rivera truck and or its trailer to strike or collide into the rear quarter panel of the Esopa vehicle and the Pedican truck also struck the Esopa vehicle. (Tr. at 32–33, 81–113, 128–30, 440–41). It is more likely than not that Rivera's truck slammed into the median divider before its trailer struck the Esopa vehicle. (Tr. at 365). Esopa's vehicle sustained damage on the driver and passenger sides. Despite Sergeant Rivera's denial, the Rivera truck or its trailer struck Esopa's vehicle. (Tr. at 375).

17. The Court discredits the testimony provided by Andrew Rigel, an assistant driver riding in Rivera's truck, who testified that neither the Pedican nor the Rivera truck had any physical contact with any other vehicles, and that the Pedican vehicle did not jackknife but just went off the side of the road. (Rigel Deposition at 67–69).

18. Officer Conlon testified that there was no damage to the Rivera vehicle. The lack of damage to Rivera's five ton truck and or its trailer is not material to the issue of whether it struck a mid-size car. Officer Conlon was not an eye witness to the accident, and it cannot be gainsaid that

4. The "Jake brake" permits an operator to manually apply the trailer's rear brakes from the steer- ing wheel. (Tr. at 365).

the Esopa vehicle was nearly completely crushed. (Tr. at 236–41).

19. The Esopa vehicle sustained more that one impact, the combined force of which caused both the roof and hood to buckle and form peaks. The Esopa vehicle was spun around and partially crushed by the collisions. The damage was most extensive on the right rear door and quarter panel, in the area adjacent to where plaintiff Francine Goldstein was seated. (Tr. at 81–120, 128–30; Pls.' Ex. 23 numbers 1 through 14, Ex. 23–2, 23–3, 23–4, 23–6, 23–7.)

20. Esopa never lost control of his vehicle, however, both defendants' Pedican and Rivera lost control over their respective vehicles. (Tr. at 30–34, 49, 82–83, 88, 103, 105, 113, 130, 197, 239–40, 255, 306–08, 343–46, 364, 369–76, 396–97, 422, 427–28; Rigel Dep. at 51–52).

21. Despite Pedican's claims to the contrary, he was certainly not in complete control of his tractor-trailer. (Tr. at 306–08, 342–44, 346).

22. Pedican and the other soldiers were given instructions as to the speed and distance they should maintain between their vehicles and the vehicle directly in front of them. They were specifically directed to maintain a 100 meter gap and to drive no faster than 40 miles per hour. These instructions were pointless, however, because the operators did not have any concept of how long a meter was. (Tr. at 314–17, 380–87; Rigel Dep. at 24–25, 40–42).

23. After the vehicles finally came to rest, Rivera's truck and Esopa's car were facing eastbound in the left lane of the westbound traffic. Esopa's vehicle was up against the left rear side of Rivera's trailer and on the frame of the rear wheels. (Tr. at 233–34, 345, 366, 444).

24. Pedican's truck was off onto the right shoulder or embankment of the Expressway in a grassy, wooded area. (Tr. at 294–95, 443).

25. Esopa and Fitz were removed through the passenger side door, but Francine Goldstein could not be immediately removed. Emergency personnel had to utilize the "Jaws of Life" to remove the passenger door and the front seat to extricate the plaintiff from the rear passenger seat where she was trapped. (Tr. at 132–35).

26. Mrs. Goldstein was taken by ambulance to North Shore University Hospital where she was admitted and treated for multiple severe fractures to the right side of her body. (Tr. 135–44).

27. The negligence of defendants Pedican and Rivera caused the accident. Defendant Pedican failed to observe the rules of the road and to maintain a safe speed. Rivera was traveling too close to the Pedican truck. Both Pedican and Rivera lost control of their respective vehicles in a non-emergency situation. (Tr. 31–35, 82–83, 306–08, 336–47).

## B. *Damages*

28. Francine Goldstein was conscious and suffering from excruciatingly sharp pain immediately following the accident. She was frightened after being trapped for what felt to her to be forever. (Tr. at 132–35).

29. After being taken out of the car, she was placed in a cervical collar and taken by ambulance to the North Shore University Hospital emergency room where she was admitted for surgery. Mrs. Goldstein remained at North Shore University Hospital until October 12, 1994, a period of 12 days. (Tr. at 135–40).

30. The pain accompanying the emergency room treatment was exacerbated because Mrs. Goldstein was frightened, emotionally stressed and embarrassed as the hospital staff proceeded to cut away her clothing and her sense of dignity. (Tr. at 136–38).

31. Dr. Baruch Toledano was the attending orthopedic surgeon on call and he responded when Mrs. Goldstein arrived at the emergency room. (Tr. at 456–61).

32. Dr. Toledano was plaintiff's treating orthopedic surgeon. He is board certified in orthopedic surgery and a clinical instructor in orthopedic surgery at Cornell Medical College and New York University Medical School. Dr. Toledano is affiliated with the Parkway Hospital, the Nassau County Medical Center and North Shore University Hospital's locations in Manhasset and in Glen Cove. He has published a number of medical articles, primarily on the topic of hand surgery. (Tr. at 454–60).

33. Upon admission, Mrs. Goldstein was noted as being conscious. The physical exam disclosed that her right shoulder was swollen and black and blue, her right leg was grossly swollen and her proximal tibia and lateral ankle were tender. (Tr. at 461–66).

34. The surgical procedures involving Mrs. Goldstein's right knee, right heel and right ankle were done under general anesthesia by Dr. Toledano. Those procedures commenced on the evening of October 1, 1994 at 9:35 p.m. and did not conclude until 5:30 a.m. the following morning, October 2, 1994. (Tr. at 477–80, 496–97).

35. The knee joint is the largest weight bearing joint in the body, and Mrs. Goldstein's most severe injuries were to her knee. The x-rays revealed a comminuted fracture[5] of the tibial plateau or the tibial condyles with a depression of 2.0 centimeters or almost an inch of the medial aspect. The x-ray report disclosed that bony fragments had completely broken off in the tibial plateau. (Tr. at 466–70).

36. Plaintiff suffered an avulsion fracture[6] in the lateral tibial plateau involving both of the tibial condyles. She suffered a severely comminuted medial tibial plateau fracture with a minimally displaced lateral tibial fracture and an avulsion of the lateral tibial plateau in which the capsule and a portion of the rim of the lateral tibial plateau was pulled off. There was also a significant depression of the knee joint surface which is largely associated with post traumatic osteoarthritis. (Tr. at 475–80).

37. During the surgical procedure, the lateral tibial plateau was excised and the medial meniscus[7] was incised off the tibial plateau medially. In order to view the articular surface of the tibial plateau the meniscus had to be elevated and an incision between the bone and the meniscus was made. The meniscus was upwardly retracted and an internal fixation with plates and screws was effected and the meniscus was reattached. There were visible multiple fractures and fragments in the area of the medial tibial condyle and the bony fragments were elevated. (Tr. at 483–84).

38. Because the plaintiff suffered a depressed fracture, it was necessary to elevate the fragments and that procedure created a void. In order to prevent displacement of the bone, a bone graft was required.[8] Bone was harvested from Mrs. Goldstein's right iliac crest or pubic bone, however as it was insufficient in quantity, the bone graft had to be supplemented with cadaver bone or calcaneus chips. (Tr. at 484–86, 572). The bone chips were

---

5. A comminuted fracture consists of multiple fracture lines, which results in many segments or fragments of bones being displaced. (Tr. at 468).

6. An "avulsion" occurs when a chip of bone is pulled off with either a ligament or capsule or tendon still attached. (Tr. at 475).

7. "The menicus is a C-shaped structure interposed between the joint surface of the tibia and the femur and it acts as a shock absorber." (Tr. at 482).

8. There are two types of bone grafts: an autograft which uses the patient's own bones and an allograft which uses cadaver bone. (Tr. at 572–75).

then packed under the knee joint surface and the capsule was reattached with a screw and washer and additional screws were used to reattach the tibia. The bone was actually pulverized in certain areas and could not be perfectly reduced. A "T" plate was attached to the medial cortex and screws [9] were inserted into the plate and then into the bone so that the bone would not redisplace after surgery. (Tr. at 488). After the screws and the plate were inserted, the next surgical procedure pertained to plaintiff's ankle. (Pls.' Ex. 73).

39. Plaintiff sustained a comminuted fracture of the distal fibula which is located on the outside of the ankle joint. The lower fibula contributes to the ankle joint, carrying one sixth of its load. (Tr. at 470–73).

40. The tibia fracture extended further down into the proximal tibial shaft and into the ankle where the talar neck was fractured.[10] The talus is the bone between the heel bone or calcaneus and the tibia. The distal tibia composes a portion of the ankle joint, and as with all joints, the ankle joint has an articular surface. There was a subluxation or partial displacement but not a dislocation of the subtalar joint. The subtalar joint is located between the calcaneum of the heel bone and the talus.

41. Mrs. Goldstein sustained a "right lateral malleolus fracture, right talus fracture and right calcaneus fracture." (Tr. at 478). The surgical goal is to reduce the subluxation or slippage so that the ankle joint would be more anatomically aligned. (Tr. at 472–73). According to the hospital records: "[an] open reduction and internal fixation of the right ankle, open reduction and internal fixation of the right talus fracture with bipedicle [11] flap closure" was performed during that same surgery session. (Tr. at 490).

42. Initially an incision was made over the fracture site of the lateral malleolus and the area was exsanguinated. This exsanguination procedure occurs when a tourniquet is used to milk the blood out of the extremity to improve visualization and reduce the amount of blood loss during the surgery. Then a plate was used to hold the malleolus bone in the reduced position. Cortical screws and cancellous screws were inserted into the bone: three screws above the break and three screws below the break and another two screws were inserted into the talus. (Tr. at 493, 518). Another incision was made over the talar fracture through the muscle that provides dorsiflexion. Dorsiflexion of the ankle is the motion which brings the toes up away from the floor. (Tr. at 494). After this incision, the talar fracture was reduced and cannulated screws were inserted. The wires were lined up so that the screws could be drilled into the proper location and the wires would then be removed. (Tr. at 495).

43. The radiology report revealed that the plaintiff also suffered a "comminuted and impacted humeral neck fracture." The fracture of the humerus occurred in two planes and

9. The screws were "cannulated screws" which have holes through them that permit wire to be inserted and moved for better control and guidance, to achieve the best placement during a reduction while avoiding the need to drill numerous holes. (Tr. at 488–89).

10. A fracture of the talar neck is significant because there is a concern about a high rate of avascular necrosis which means that the bone dies due to insufficient blood supply, which can result in a collapse of the talus and post traumatic arthritis requiring ankle fusion. (Tr. at 471).

The talus is one of the few bones that does not have a muscle or tendon attachment and therefore is subject to limited vascularity or blood supply. (Tr. at 491). The plaintiff, however, had not suffered avascular necrosis as of the trial, and the Court will not speculate as to any future problems.

11. A bipedicle flap closure occurs "when there is an incision on both sides, the inside and the medial side and on the lateral side [of the foot]." (Tr. at 491).

involved the rotator cuff. (Tr. at 473–75). The right proximal humerus fracture[12] was treated non-surgically and the shoulder was placed in an immobolizer. (Tr. at 478, 495–96).

44. The extent of the injuries and surgical procedures described above were substantiated by the x-rays and CAT scans. (Tr. at 509–52; Pls.' Ex. 24).

45. When Mrs. Goldstein awoke after more than eight hours of surgery, her leg was in a cast, her arm was in a sling and her entire right side was sore. She still had a cervical collar on and could not move her head. A Foley catheter was inserted to collect urine and remained in place for three days. In order to prevent stiffness to her knee, a continuous passive motion machine or CPM machine was attached to Mrs. Goldstein's right knee. She could not move her leg by herself because a pneumatic antiembolism stocking, or "PAES,"[13] was positioned on her right leg and ice packs were applied to the knee to reduce swelling. In the hospital and upon discharge, plaintiff was in a hinged knee brace to prevent the fracture from displacing. (Tr. at 138–45, 500–03, 596).

46. Mrs. Goldstein was fed intravenously for a few days. When she was allowed to eat, she required assistance because she is right-handed and her right arm was immobilized. (Tr. at 142).

47. Mrs. Goldstein needed assistance for all personal hygiene functions throughout her hospital stay. In order to reduce the risk of decubitus ulcers,[14] she had to be turned and repositioned in bed every two hours. (Tr. at 138–45, 501, 507–09).

48. Plaintiff was given a morphine pump and administered Dilaudid and Percocet for pain, and Heparin to reduce the risk of blood clots. (Tr. at 141, 499–507).

49. The hospital records and Dr. Toledano's notes contain various complaints of pain from Mrs. Goldstein. (Tr. at 505, 577–84; Pls.' Ex. 9: Hospital Record for 10/7/94, 10/10/94). Dr. Toledano ordered a psychological consultation for Mrs. Goldstein because she told him that she was depressed and that she had been crying. (Tr. at 502).

50. On October 12, 1994, Mrs. Goldstein was discharged from North Shore University Hospital with a cast on her leg and a cast on her arm and was directly admitted to St. Charles Rehabilitation Hospital ("St. Charles"). She remained there for five weeks and engaged in physical therapy twice a day. The primary rehabilitative goal was to strengthen her left side to enable her to perform certain tasks, while her right side remained non-weight bearing for a period of six weeks for her upper extremity, and twelve weeks for her lower extremity. (Tr. at 144–48, 503–04).

51. Mrs. Goldstein was admitted to St. Charles a second time for the period of January 4, 1995 through February 3, 1995. (Tr. at 693–96).

52. At St. Charles, Mrs. Goldstein was again frightened and felt alone. Plaintiff was further frustrated by the difficulty of therapy, and fearful that she would never get out of the wheel chair. Mrs. Goldstein was also treated by Dr. Debra Smith, a psychologist at St. Charles. (Tr. at 146–52).

12. The humerus is the upper bone of the arm that extends from the shoulder joint to the elbow joint. Since proximal describes a location nearest the point of attachment, in this instance the shoulder, the plaintiff's fracture was towards the area where the rotator cuff attaches. An "impact" fracture occurs where the bone is broken and one end or segment is driven or wedged into the interior of the other, as opposed to a "separation" fracture where the distance between the two segments is increased.

13. The stocking is a device that pumps air through a sleeve placed on the leg to provide an external compression to increase blood flow through the leg, and to reduce the risk of blood clots. (Tr. at 499).

14. Decubitus ulcers posed a constant concern during her time at North Shore University Hospital, the St. Charles Rehabilitation Hospital and while non-ambulatory at home. This condition occurs when the skin breaks down as a result of the continuous pressure of the body in bed or in a wheelchair, especially in the sacral region of the body. (Tr. at 507–08).

53. Plaintiff's primary doctor at St. Charles was Dr. Lois S. Saltzman. Dr. Saltzman is physician board certified in physiatry or physical rehabilitation, and was in charge of Mrs. Goldstein's rehabilitation and physical and occupational therapy,[15] and still treats plaintiff. (Tr. at 678–81, 696).

54. Because the plaintiff's right side was injured on multiple levels requiring her to remain non-weight bearing on both her upper and lower extremities, plaintiff's condition resembled a hemiplegic—one who has suffered a stroke. Her initial treatment plan focused on using her left side for mobility in bed, transferring from bed to chair, standing, and maintaining her balance and she used a CPM machine to maintain and increase her knee's range of motion. She required 24 hour supervision and assistance. (Tr. at 683–87).

55. The healing process was extremely painful, incorporating the removal of debris from the sutures and undergoing arduous physical therapy. To alleviate the pain, Percocet was given and to alleviate anxiety, Xantax was administered. To prevent decubitus ulceration plaintiff was turned in bed every hour and an alternating air mattress was prescribed when plaintiff was released from St. Charles. (Tr. at 687–92).

56. When plaintiff was initially released from St. Charles, in addition to the alternating air mattress, she was sent home with a hospital bed with a trapeze, a reacher, a commode, a shoe horn and prescriptions for round the clock home health care aides. (Tr. at 152–155, 689–91). Her family added a wheelchair ramp onto the house so that she could be taken outside on occasion. She was fed, bathed and cared for by home health care aides, however, they regularly failed to show up as scheduled. Since plaintiff Allan Goldstein worked evenings, Francine Goldstein was totally dependent on the aides, and when they did not report to work, she had to have her 23 year old son stay overnight in order to assist her to use the bathroom. During this period, she was treated by a physical therapist who came to the house and performed painful, non weight bearing exercises with the plaintiff. (Tr. at 152–56).

57. On January 4, 1995, Mrs Goldstein was again admitted to St. Charles and was given weight bearing rehabilitation for her upper and lower right extremities. By January 1995, Mrs. Goldstein was suffering from painful and severe osteoporosis stemming from her disuse of her lower right leg.[16] It was painful for her to walk so she used an aquaciser, a miniature treadmill in a water tank. In essence, plaintiff had to retrain her right side to function, despite the pain of severe osteoporous and the problems of muscle atrophy. (Tr. at 693–97).

58. Mrs Goldstein's knee and ankle made general improvements during the eighteen months following the accident, culminating in full flexion of the knee and no evidence of osteoarthritis in the ankle. (Tr. at 585–86).

59. Almost three years after the accident, Mrs. Goldstein was still experiencing substantial pain and after consultation with her doctor decided to have the screws and the plate in her knee removed. On July 28, 1997, Dr. Toledano removed the hardware from her knee in a procedure lasting 30 to 40 minutes. (Tr. at 589). X-rays taken after the surgery disclosed that the plaintiff had post-traumatic arthritis of the medial aspects of the knee joint. Despite the removal of the hardware, Mrs. Goldstein still continues to experience pain and she will continue to experience pain, in the future. (Tr. at 589, 541–43; Ex. 73).

60. In sum, the medical testimony and evidence demonstrated that the accident caused plaintiff to sustain the following injuries: (1) a right proximal humeral fracture; (2) an impacted humerus neck fracture; (3) a right lateral malleolus fracture; (4) a right non-displaced calcaneus fracture; (5) a right displaced talar fracture; (6) a right impacted talus fracture; (7) a right subluxation of the subtalar joint; (8) a right medial tibial pla-

**15.** "[O]ccupational therapy ... focuse[s] on basic activities of daily living, such as bathing, toileting, dressing." (Tr. at 685).

**16.** Mrs. Goldstein sustained disuse osteopenia which is equivalent to disuse osteoporosis. (Tr. at 518–19).

teau fracture,[17] which was depressed and comminuted, (9) a right lateral tibial plateau fracture with an avulsion fraction of the tibia. (Tr. at 543–45, 592–95, 603–04; Ex. 26: x-ray).

61. Plaintiff's recovery was lengthened, compounded and complicated primarily because she sustained these multiple injuries to the same side of her body. (Tr. at 531, 545).

62. Presently, Mrs. Goldstein has a pronounced limp and must use a cane when she walks. Her walk is oblique and asymmetrical, and she suffers from post-traumatic osteoarthritis in her right knee joint. (Tr. at 584, 707–08).

63. The pain will exacerbate and the limp will become more pronounced until a knee replacement is performed. Knee replacement surgery, however, is a complicated procedure with attendant risks and no guarantee of complete recovery. (Tr. at 552, 604–07).

64. Mrs. Goldstein also suffers from right shoulder pain secondary to tendonitis in the rotator cuff. The ankle and talus fractures cause intermittent episodes of pain. In addition, plaintiff sustained a permanent loss of feeling on the dorsum and the plantar aspect of her right foot. (Tr. at 705–06). Plaintiff is left with surgical scars accompanied by decreased sensation or loss of feeling in those areas, and a decrease of feeling on the bottom of her foot. (Tr. at 538–41, 549–51). These injuries are permanent. (Tr. at 546–54).

65. Plaintiff will require orthopedic care for the rest of her life. (Tr. at 706–07). Future treatment for plaintiff, in view of her life expectancy, will likely include a total knee replacement within two to five years [18] and a second replacement 10 to 15 years later. (Tr. at 547–48, 597, 709). Following knee replacement surgery, plaintiff will require a physical therapy regimen of seven days a week for five to six weeks and then three to five days thereafter, for up to one year. (Tr. at 710).

66. Mrs. Goldstein has received physical therapy and will continue to need physical therapy two to three times a week for the rest of her life, at a cost of $100 per session. Plaintiff has never missed an appointment, and other than a short respite in the Fall of 1996, she has continuously received physical therapy for the injuries she sustained in the accident. (Tr. at 706–12).

67. Mrs. Goldstein has experienced considerable pain in the past, and will continue to experience pain in the future. Since her last release from St. Charles, she substantially limited her pain medication to over-the-counter extra strength Tylenol. (Tr. at 183, 210–12).

68. Three months after the accident, Mrs. Goldstein was able to walk with an assist device and no longer required a wheelchair. (Tr. at 178).

69. Plaintiff was able to return to work five months after the accident. (Tr. at 211).

70. The cost of a total knee replacement, including surgery and hospitalization, is currently less than the $50,000 estimated by Dr. Toledano, and more in the range of approximately $30,000 to $40,000.[19] (Tr. at 547–48, 599–601, 604–08). At present, each post-operative office visit with Dr. Toledano costs $100.[20] (Tr. at 557–58). Furthermore, if the

---

**17.** "The medial plateau as opposed to the lateral plateau takes most of the load when a person stands or walks because the forces are directed towards the center of the body, towards the inside of the knee. So actually the wear is accelerated over time and the prognosis is much poorer in a medial plateau than if there was a similar injury in a lateral plateau." (Tr. at 610).

**18.** After removal of the hardware, if the pain continues, the only option for the plaintiff is a knee replacement and positive results are recorded in approximately 90% of such surgeries. (Tr. at 587–88).

**19.** Although Dr. Toledano has not done a total knee replacement surgery since he began his private practice, he does work with a group of orthopedic surgeons and appears to have sufficient experience in setting his own fees and knowledge of hospital costs as to render an educated estimate of the cost of a knee replacement. (Tr. at 563, 599–601). Surgical and hospitalization costs do not include x-rays after surgery, which would cost $50 to $75 per set for two sets for removal of the ankle hardware, and two to three sets for the knee replacement. (Tr. at 558–59).

**20.** Although some of the follow up visits would be included in the surgery fee, after that period the plaintiff would be charged for each additional required visit. (Tr. at 558).

ankle hardware becomes a source of discomfort, it will have to be removed. The current cost to remove the ankle hardware, including surgery and hospitalization, is $10,000. (Tr. at 547).

71. At the Government's request, Dr. Edward Crane, an attending orthopedic surgeon at Lenox Hill Hospital, examined Mrs. Goldstein on October 28, 1996 and September 24, 1997. While Dr. Crane did attempt to minimize Mrs. Goldstein's injuries, he did admit that plaintiff will need at least one knee replacement and suffers from degenerative osteoarthritis as a result of the accident. On behalf of the City of New York, Dr. Crane performs 50 to 75 examinations of plaintiffs per year. He is affiliated with only one hospital, and has never published a single article in the field of orthopedics. Dr. Crane does not perform knee replacements, but refers those patients to other surgeons. (Tr. at 745–82, 784–94, 796). His estimate of the cost of a total knee replacement was $25,000. Dr. Toledano testified that the cost of a knee replacement was $50,000. (Tr. at 548, 600–01).

72. The Court concludes that as compared with Dr. Crane, Dr. Toledano and Dr. Saltzman possess superior knowledge and expertise and their testimony was more credible as it pertained to the plaintiff's injuries.

73. Prior to the accident, Mrs. Goldstein enjoyed general good health and never suffered any serious fractures or underwent any significant surgery. (Tr. at 122–23).

74. While plaintiff did suffer from Graves disease or an overactive thyroid, a gastrointestinal reflux condition and a hiatal hernia, all these problems were treated with medication and did not affect her ability to perform her employment or engage in recreational activities. Moreover, prior to the accident, Francine Goldstein never sustained any injuries to her right shoulder, leg or foot, affecting her ability to walk, her balance, or her ability to take care of her personal needs. (Tr. at 122–25).

75. Since the accident, Francine Goldstein does not go out or socialize as she previously partook and enjoyed. (Tr. at 90–91). The plaintiff always uses her cane outside the house and limps when she walks house without it inside the house. (Tr. at 265–66).

76. She had been working at various school district offices since March of 1979, and her post-accident employment has continued at the Coram Elementary School, in the position of secretary and senior clerk typist. (Tr. at 121–22).

77. The Goldstein's martial relationship during the ten years preceding the accident was less than idyllic, and the injuries suffered by Francine Goldstein did little to foster wedded bliss. (Tr. at 216–19, 266–67).

78. Plaintiffs were married on May 14, 1960. They have always lived together and have raised four adult children who no longer live at home. (Tr. at 119–20, 258).

79. Plaintiff Allan Goldstein has been a journeyman printer his entire adult life. In 1990, due to a decreased demand for printers, Mr. Goldstein was forced to take a night shift nonunion position in Manhattan. He has since spent 6 hours each day commuting and has worked long hours. As a consequence, he has rarely seen his wife who works during the day. (Tr. at 259–74). Furthermore, Mrs. Goldstein worked part-time at a catering job on weekends and some evenings before the accident. Either by design or necessity, plaintiffs' schedules resulted in their spending a minimal amount of time with each other. (Tr. at 274).

80. Although the Goldsteins did not spend much time in each others company, prior to the accident, Mrs. Goldstein would do the housekeeping, cooking and laundry. Since the accident she has not been able to do "very much" for Allan. (Tr. at 262, 274).

81. Now, both plaintiffs share the laundry and the vacuuming and Mr. Goldstein does the cooking and grocery shopping. (Tr. at 274–76, 278).

82. While Mr. Goldstein appears to have been less than fully sympathetic towards Mrs. Goldstein's plight during her recovery period, he did visit her at North Shore University Hospital and at St. Charles. (Tr. at 263–64, 271–73, 277–78). Admittedly, he has not been overly attentive to his wife's health care needs, but he attributes this situation to

his long work hours. According to Mr. Goldstein, things have changed since their years as newlyweds, a circumstance the Court notes as not uncommon in a marriage that has exceeded thirty years. Furthermore, Mr. Goldstein's inability to convey sentiments of romantic passion for his wife does not diminish the pride he felt for Mrs. Goldstein's attributes as "an exceptional hard worker" who bowled, went dancing, had an extra job and a full life. (Tr. at 266–67).

83. Since the accident, and despite the return of almost full flexion in her knee joint, Mrs. Goldstein experiences great difficulty going up and down the stairs and she sleeps on the first floor on a convertible couch in the den, no longer sharing a bed with Mr. Goldstein. (Tr. at 265–66).

84. Mrs Goldstein's date of birth is January 30, 1942, and she has a life expectancy of 26.0 years or until the age of 82. (Tr. at 119, 833–34; National Center for Health Statistics, Vital Statistics of the United States, 1989, vol II § 6—Life Tables).

## II. CONCLUSIONS OF LAW

### A. *General Statutory Provisions and Principles*

■ It is axiomatic that the doctrine of sovereign immunity bars suit against the United States without its consent. *See United States v.. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Pursuant to the Federal Tort Claims Act, the federal government has consented to be sued for the "negligent or wrongful acts or omissions" of its employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Therefore, as the accident in question occurred in New York, liability is to be determined under the law of New York. As the Vehicle and Traffic Law § 388 holds the owner of a vehicle liable for injuries resulting from the negligence in the use or operation of the vehicle by a person operating it with the owner's permission, and all parties agree that the operators of the Army

vehicles were acting within the scope of their employment at the time of the accident, the issue to be determined is whether the Army vehicles were negligently operated.

### B. *New York Vehicle and Traffic Law*

■ The applicable statutes and principles of liability under New York law impose a duty upon drivers to operate their vehicles with reasonable care taking into account the actual and potential dangers existing from weather, road, traffic and other conditions. *See Bradt v. Lancaster,* 671 N.Y.S.2d 199, 200 (3d Dep't 1998); *Terrell v. Kissel,* 116 A.D.2d 637, 638–39, 497 N.Y.S.2d 716, 718 (2d Dep't 1986). This longstanding duty requires drivers to maintain a reasonably safe rate of speed, have the automobile under reasonable control, to keep a proper lookout under the circumstances then existing to see and be aware of what was in their view, and to use reasonable care under the circumstances to avoid an accident. *See Oberman v. Alexander's Rent–A–Car,* 56 A.D.2d 814, 815, 392 N.Y.S.2d 662, 664 (1st Dep't 1977); *Tenczar v. Milligan,* 47 A.D.2d 773, 774, 365 N.Y.S.2d 272, 274 (3d Dep't 1975); *see also* New York Pattern Jury Instructions, Third Edition, (hereinafter "PJI") 2:77.

Specific applicable provisions of the New York State Vehicle and Traffic Law ("V.T.L.") mandate that "[n]o person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing." V.T.L. § 1180(a); *see People v. Lewis,* 13 N.Y.2d 180, 189, 245 N.Y.S.2d 1, 194 N.E.2d 831 (1963) (finding § 1180(a) constitutional); *Sonntag v. Dor-Vac Corp.,* 192 A.D.2d 594, 597, 596 N.Y.S.2d 162, 165 (2d Dep't 1993). Moreover, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the conditions of the highway." V .T.L. § 1129(a); *see McCarthy v. Miller,* 139 A.D.2d 500, 500, 526 N.Y.S.2d 848, 849 (2d Dep't 1988).

Essentially the defendants, in particular Specialist Pedican, were charged with the duty to see that which under the facts and

circumstances he should have seen by the proper use of his senses. While a motorist is not expected to anticipate that a vehicle going in the opposite direction will cross a median and proceed in the wrong direction, *Tenenbaum v. Martin,* 131 A.D.2d 660, 661, 516 N.Y.S.2d 741, 742 (2nd Dep't 1987), certainly a driver should recognize that a vehicle accelerating on the shoulder of the same side of the road with a directional displayed, intends to enter the traffic flow.

■ Moreover, if a vehicle suddenly stops and skids, due to a failure to maintain a safe distance, then negligence on the part of the driver can be inferred. *See Canfield v. Giles,* 182 A.D.3d 1075, 1075, 585 N.Y.S.2d 242, 243 (4th Dep't 1992); *see also* PJI 2:84 which provides in relevant part,

"[t]he fact that defendant's motor vehicle skidded, ... should be taken into consideration in determining whether the defendant exercised reasonable care in its operation, ... taking into consideration all the facts and circumstances existing at the time of the accident, including the condition of the defendant's car, the condition of the weather and the speed at which defendant was operating his vehicle, ... [if the trier of fact] decide[s] that the defendant's car skidded because of his failure to use reasonable care,"

then a finding of negligence will result.

### C. *The Emergency Doctrine*

■ The Government has consistently argued that it is entitled to a finding of liability in its favor because of the emergency doctrine. It bases this claim on a theory of double emergencies and argues that Pedican was faced with an emergency when the POV cut him off, causing a valid reasonable response, which caused a second emergency for Rivera. While "there is no legal duty to protect against an occurrence which is extraordinary in nature and, as such, would not suggest itself to a reasonably careful and prudent person as one which should be guarded against," *Viegas v. Esposito,* 135 A.D.2d 708, 709, 522 N.Y.S.2d 608 (2d Dep't 1987), *appeal denied,* 72 N.Y.2d 801, 530 N.Y.S.2d 553, 526 N.E.2d 44 (1988) (internal quotations omitted), "it is settled law that the emergency doctrine has no application where, as here, the party seeking to invoke it has created or contributed to the emergency." *Sweeney v. McCormick,* 159 A.D.2d 832, 552 N.Y.S.2d 707, 708 (3d Dep't 1990) (citing *Martin v. Alabama 84 Truck Rental, Inc.,* 47 N.Y.2d 721, 417 N.Y.S.2d 56, 390 N.E.2d 774 (1979)).

In situations where drivers are confronted with completely unexpected circumstances, such as a vehicle entering the roadway traveling in the opposite direction, *Vatter v. Gibson,* 228 A.D.2d 581, 644 N.Y.S.2d 545 (2d Dep't 1996), or a vehicle suddenly careening off a median into an adjacent vehicle, *Roman v. Vargas,* 182 A.D.2d 543, 582 N.Y.S.2d 1020 (1st Dep't 1992), or a vehicle forcefully applying the brakes to avoid a head-on collision with an oncoming vehicle that was attempting to pass vehicles in the opposite direction of travel, and is rear-ended, *Madden v. Mullet,* 211 A.D.2d 623, 621 N.Y.S.2d 624 (2d Dep't 1995), the application of the emergency doctrine is warranted. This was not such an instance. Contrary to the facts in *Nieves v. Manhattan and Bronx Surface Transit Operating Authority,* 31 A.D.2d 359, 364, 297 N.Y.S.2d 743, 745 (1st Dept.1969) wherein the bus driver was faced with the sudden unexpected swerving of an adjacent vehicle into the path of his bus, defendant driver Pedican saw the adjacent vehicle ahead, was aware that it was attempting to enter the roadway and had sufficient time to flash his lights and sound his horn before the vehicle entered onto the roadway. Nor is Rivera necessarily entitled to an emergency defense since the weight of the evidence established that he was traveling too close to the Pedican truck to avoid the accident once Pedican lost control of his vehicle and Rivera was aware of the potential problem posed by the POV as it attempted to enter the right lane. *See, e.g., Felder v. Carolina Freight Carriers,* 156 A.D.2d 540, 540, 548 N.Y.S.2d 809, 810 (2d Dep't 1989) (emergency doctrine inapplicable in three vehicle pile-up collision); *McCarthy v. Miller,* 139 A.D.2d 500, 500, 526 N.Y.S.2d 848, 848 (2d Dep't 1988) (emergency doctrine inapplicable because the defendant was required to maintain a reasonably safe distance from the vehicle he was following and to be aware of traffic conditions); *Hardy v. Sicu-*

*ranza,* 133 A.D.2d 138, 139, 518 N.Y.S.2d 812, 813 (2d Dep't 1987) (emergency doctrine inapplicable where defendant skidded on wet pavement before accident); *Kowchefski v. Urbanowicz,* 102 A.D.2d 863, 477 N.Y.S.2d 47(2d Dep't 1984) (sudden stop of vehicle in front of defendant did not warrant defense of emergency doctrine in rear-end collision).

 Even, assuming *arguendo,* Rivera was entitled to an emergency defense because he was suddenly faced with Pedican's truck coming at him, the Government's liability for plaintiff's injuries is not diminished. The Government owns both army tractor-trailers and is responsible for the negligence of either or both drivers. The negligence of one government driver, that causes an emergency situation for another government driver, does not create a superceding intervening cause which breaks the chain of causation, rather, it is a foreseeable consequence of the initial negligence. The emergency doctrine cannot serve as a basis to avoid responsibility for injuries sustained by a harmless third party, when such injuries were caused by the defendant's initial negligence. It must be remembered that Pedican's vehicle also struck the Esopa vehicle, and neither party attempted, nor will the Court undertake, to apportion plaintiff's specific injuries or to determine the source tractor-trailer from amongst the collisions and impacts Esopa's vehicle experienced. Accordingly, in light of this Court's determination that the negligence of Pedican and the negligence of Rivera have been established by a preponderance of the evidence, the Government is liable for the plaintiff's injuries and damages.

## III. DAMAGES

 The plaintiffs are entitled to recover fair and just compensation for any injuries proximately caused by the negligence of the Government's employees. Such damages may include compensatory damages, past and future pain and suffering, past and future medical, hospital, nursing and therapy expenses and loss of consortium. *See Tate v. Colabello,* 58 N.Y.2d 84, 87, 459 N.Y.S.2d 422, 424, 445 N.E.2d 1101 (1983) (citing PJI 2:280,

2:281); *McDougald v. Garber,* 73 N.Y.2d 246, 257, 538 N.Y.S.2d 937, 941, 536 N.E.2d 372 (1989); *see also* PJI 2:280, 2:280.1, 2:280.2; 2:315.

 It has long been recognized that plaintiffs' damages must be susceptible of ascertainment in a manner other than mere speculation. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). The estimation of plaintiff's future medical expenses can be determined with reasonable certainty, and although no precise rule can be formulated to measure pain and suffering and loss of consortium, an analysis of comparable injuries and the decisions those judges and juries rendered provides appropriate guidance. Review of appellate decisions which apply the "deviate[ ] materially from ... reasonable compensation" standard of review to determine whether jury awards are excessive or inadequate in diversity cases adds further insight. *Consorti v. Armstrong World Indust.,* 72 F.3d 1003, 1011 (2d Cir.1995); N.Y.Civ.Prac.L. & R. § 5501(c) (McKinney Supp.1995). To determine whether a jury award deviates materially from what would be reasonable compensation, New York State courts also compare the award in question to verdicts approved in similar cases.

The Government argues that this Court, sitting as the trier of fact, "is not bound by the outer limit of damages that would not 'shock the judicial conscience' of the appellate court." (Def.'s Post–Trial Br. on Damages, p. 7). In fact, the Government claims that published jury verdict reports upon which the plaintiffs seek this Court to rely are irrelevant. This is asserted because when Congress passed the Federal Tort Claims Act it denied plaintiffs a jury trial in order "to protect the public fisc from exactly the kinds of runaway verdicts that are often found in the (same) jury verdict reports." (*Id.* at 3). Aside from fostering Congressional protection of public funds, the Government advises that the Court should also disregard these jury verdict reports because such reports do not reflect reduction of verdicts on appeal or settlements prior to appeal. In certain instances, subsequent reductions may not be reflected in the jury

verdict Reporters, however, as the trier of fact, a judge can draw from his or her own experiences in combination with the reported cases in calculating a sum that will reasonably compensate a plaintiff. In this calculus, the Court appropriately reduces those awards that materially deviate from reasonable compensation. On balance, whether the court employs jury verdict reports, appellate decisions or selected federal cases to measure the damages, the plaintiffs are still entitled to reasonable compensation and all available relevant comparable awards and reductions should be considered in the process. In these instances, surfeit, not dearth sources of information are advantageous.

The Government, however, importunes the Court to consider only one case as guidance and precedent. In comparison, the injuries of the 33 year old plaintiff in *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680 (2d Cir.1993), were more severe than the injuries sustained by Mrs. Goldstein. Scala required two arthroscopic surgeries, six months in a wheelchair, psychiatric treatment for depression and he was permanently unable to return to work as a longshoreman. His jury verdict of $2,000,000 for past and future loss of earnings and pain and suffering was remitted to $750,000 or a new trial. However, the circumstances are not so analogous as to eliminate the need to consider other factual situations and award information garnered from comparable cases.

A. *Knee Injuries*

Mrs Goldstein's primary injury was to her knee. Generally, a review of serious fracture cases provided by the plaintiffs and additional cases reviewed by the Court reflect a range of $400,000 to $1,280,000 for knee and leg fractures with an average of approximately one million dollars, exclusive of loss of earnings. *See Parros v. 1500 Realty Co.*, 226 A.D.2d 607, 641 N.Y.S.2d 372 (2d Dep't 1996) (forty-one year old plaintiff; knee and ankle injuries; award of $158,000 for past pain and suffering and $375,000 for future pain and suffering was found to be excessive, and the plaintiff was requested to accept a reduction to $100,000 and $200,000, respectively); *Lemberger v. City of New York*, 211 A.D.2d 622, 621 N.Y.S.2d 625 (2d Dep't 1995) (seventy-three year old plaintiff sustained tears to the interior and posterior portions of both the medial and lateral menisci of left knee; award of $400,000 for past and future pain and suffering reduced to $300,000); *Burton v. New York City Housing Auth.*, 191 A.D.2d 669, 595 N.Y.S.2d 807 (2d Dep't 1993) (twenty-six year old plaintiff sustained a knee injury consisting of a ruptured meniscus and related damage to the knee; court applied "materially deviates" test and reduced the award of $525,000 for total pain and suffering to $262,500); *Castellano v. City of New York*, 183 A.D.2d 800, 584 N.Y.S.2d 114 (2d Dep't 1992) (plaintiff slipped on an icy sidewalk, resulting in an injury to his knee which required two arthroscopic surgeries and forced him to retire from his job as a police officer; jury award of $500,000 for pain and suffering was found to be excessive and court ordered remittitur of damages over $200,000); *Bisbee v. Independent Coach Corp.*, 182 A.D.2d 661, 582 N.Y.S.2d 255 (2d Dep't 1992) (affirming award of $253, 000 for injury to knee which required several operations and procedures to repair and alleviate pain); *Stern v. Calzado*, 163 A.D.2d 299, 557 N.Y.S.2d 156 (2d Dep't 1990) (affirming award of $500,000 for pain and suffering for a fractured rib, chondromalacia of the left patella, and an injury to the back); *Gonzalez v. Manhattan and Bronx Surface Transit Operating Auth.*, 160 A.D.2d 420, 554 N.Y.S.2d 116 (1st Dep't 1990) (award of $1.2 million for pain and suffering for torn knee cartilage sustained in car accident was excessive and ordered reduced to $600,000); *Menga v. Raquet*, 150 A.D.2d 434, 541 N.Y.S.2d 43 (2d Dep't 1989) (affirming award of $350,000 for cartilage damage to knee); *Rose v. Rose*, 148 A.D.2d 693, 540 N.Y.S.2d 204 (2d Dep't 1989) (award of $295,000 for three fractured vertebrae and soft tissue damage to the knee was excessive and should be reduced to $175,000); *Tejada v. City of New York*, 129 A.D.2d 697, 514 N.Y.S.2d 459 (2d Dep't 1987) (plaintiff's injured knee required several surgical procedures and resulted in chronic pain in her back and knee; jury award of $1,426,431 found to be clearly excessive and ordered reduced to $700,000); *Ziegler v. New York City Housing Authority*, Bronx Supreme

Court Index 13079/92, Jan. 31, 1997 (a 57 year old homemaker who walks with a limp and uses a cane as a result of a fractured tibial plateau with an open reduction and internal fixation which will require a total knee replacement in five years received $300,000 for past pain and suffering and $1,000,000 for future pain and suffering); *Villegas v. New York City Transit Authority,* Kings Supreme Court Index 23723/91, July 1996 (a 37 year old assistant teacher's jury verdict of $6,000,000 which included $5,500,000 for pain and suffering was reduced by the court to $740,000; the injuries included multiple fractures of the tibia, fibula and malleolus with an open reduction and internal fixation resulting in a permanent limp and a year out of work); *Pinhiero v. City of Peekskill,* Westchester Supreme Court Index 6982/92, April 25, 1996 (a 55 year old laborer sustained a fractured tibial plateau and settled prior to trial for $1,000,000); *Merenda v. Consolidated Rail,* Orange Supreme Court Index 6099/92, Dec. 13, 1995 (a 58 year old welfare examiner sustained comminuted fractures of the right tibia, fibula, femur, and a crush injury to the left heel and severe facial lacerations which required three separate hospitalizations for removal of the hardware and a total knee replacement; jury award of $1,500,000 for past pain and suffering and $550,000 for future pain and suffering and past and future medical expenses and loss of earnings for a total award in excess of $2,400,000); *Sheehan v. MABSTOA and NYCTA,* New York Supreme Court Index 2521/90, July 16, 1992 (a 36 year old carpenter who sustained damage to his medial femoral condyle, patellar facet and medial meniscus underwent two arthroscopic surgeries and will require future knee replacement received a jury award of $250,000 for past pain and suffering and $1,000,000 for future pain and suffering, with additional awards for loss of earnings and an additional award of $110,000 for loss of services); *Dempsey v. Consumers Distributing Co.,* Kings Supreme Court Index 12022/84, Jan. 26, 1990 (a 55 year old truck driver received $1,281,015 after court's reduction which included $320,000 for past pain and suffering and $500,000 for future pain and suffering on torn meniscus of the left knee requiring two meniscectomies,

with chondromalacia, traumatic arthritis and a future knee replacement); *Messina v. Basso,* Kings Supreme Court Index 11895/87, Dec. 21, 1989 (a 72 year old woman received a jury award of $750,000 solely for pain and suffering reduced to $400,000 by the court for multiple comminuted fractures of the tibia and fibula with six screws and the removal of the lateral meniscus and collateral ligament and a lifetime confinement to a wheelchair); *D'Amico v. Newcastle Rent–A–Car Corp.,* New York Supreme Court Index 3215/79, Feb. 15, 1983 (a 47 year old woman with torn medial menicus of both knees received a jury award of $1,000,000 and her husband received $50,000 for loss of services); *Danko v. Pelham Funeral Chapel,* Bronx Supreme Court Index 8929/81, June 9, 1982 (a 55 year old woman sustained a fractured knee with torn ligaments and psychological injury, jury award of $500,000 with an additional $80,000 for loss of consortium for her spouse); *Clark v. Harper,* New York Supreme Court Index 5512/76, Jan. 15, 1982 (a 68 year old woman with fractures of both legs and open reduction was awarded $2,250,000, which included loss of earnings).

### B. *Ankle Injuries*

Mrs Goldstein's secondary injuries are to her ankle and foot, and the damages are reflected in the following decisions encompassing tibia and ankle fractures. *See Gilliam v. Vasilis,* 225 A.D.2d 509, 639 N.Y.S.2d 804 (1st Dep't 1996) (a 63 year old woman employed as a home attendant fractured four metatarsal bones which required an open reduction and internal fixation resulting in a permanent limp and the use of a cane, was entitled to $450,000 for past and future pain and suffering, reduced from the jury verdict award of $600,000); *Brito v. Consolidated Edison Co. of New York,* 233 A.D.2d 122, 649 N.Y.S.2d 424 (1st Dep't 1996) (a 35 year old laborer received $45,000 in past pain and suffering and $180,000 for future pain and suffering for a fractured calcaneus with a lumbar sprain); *Pearson v. Carraturo,* 210 A.D.2d 387, 620 N.Y.S.2d 95 (2d Dep't 1994) (an award of $250,000 representing $100,000 for past pain and suffering and $150,000 for future pain and suffering was not excessive

for a 24 year old female who sustained an open reduction, an insertion of wires and three surgeries to save her toes); *Herrera v. V.B. Haulage Corp.,* 205 A.D.2d 409, 613 N.Y.S.2d 883 (1st Dep't 1994) (a 55 year old kitchen worker suffered a torn rotator cuff and a fractured distal tibia and fibula with open reduction and internal fixation and post-traumatic stress depression; the appellate court reduced the verdict from $870,000 for past pain and suffering to $650,000; future pain and suffering was reduced from $535,000 to $250,000); *Rohring v. City of Niagara Falls,* 192 A.D.2d 228, 601 N.Y.S.2d 740 (4th Dep't 1993) (a construction worker in his thirties obtained a structured gross judgment of $2,500,000 for a fractured calcaneus requiring multiple surgeries); *Van Derzee v. Knight–Ridder Broadcasting Inc.,* 185 A.D.2d 1011, 586 N.Y.S.2d 839 (3d Dep't 1992) (a $300,000 verdict for pain and suffering was affirmed on appeal for an 80 year old woman who had suffered a fractured calcaneus with a closed reduction and spent 17 days in the hospital and 9 weeks in a geriatric center; the verdict distribution allocated $180,000 for past pain and suffering and $120,000 in future pain and suffering); *Venable v. New York City Transit Authority,* 165 A.D.2d 871, 560 N.Y.S.2d 341 (2d Dep't 1990) (jury award reduced from $4,000,000 to $1,5000,000 for 40 year old female accountant who sustained a fractured tibia requiring substantial hospitalization and possible amputation); *Felix v. Herby Realty Corp.,* Kings Supreme Court Index 23570/93, April 22, 1996 (a 43 year old unemployed male suffered a ruptured Achilles tendon, fractured os calcis (heel bone) requiring open reduction and internal fixation resulting in $119,000 for past pain and suffering and $240,000 for future pain and suffering and $10,000 in past medical expenses); *Crescimanno v. Associated Universities, Inc.,* Suffolk Supreme Court Index 28278/91, May 15, 1995 (a 43 year old asbestos remover settled his action for $1,000,000 plus waiver of a $108,000 Workers Compensation lien for a comminuted fracture of the left os calcis and calcaneus which required open reduction and internal fixation with a left calcaneal osteotomy and left iliac crest bone graft and subsequent readmission for removal of hardware and calcaneus osteoplasty and subtalar arthrodesis with a bone graft from the right iliac crest due to traumatic arthritis); *Patterson v. D & G Builders, Inc.,* Erie Supreme Court Index 14534/92, Dec. 13, 1994 (a 33 year old construction worker sustained a fracture of the right calcaneus, missed work for nine months and complained of pain in the heel with difficulty walking and climbing stairs, received $375,000 in settlement); *Grim v. Kulcsar,* Suffolk Supreme Court Index 7521/92, Oct. 21, 1994 (39 year old civil engineer sustained bilateral fractured os calcis with flattening of the talocalcaneal joints and extreme sclerotic changes in joints and projected degenerative arthritis in both feet in the future, obtained an award of $500,000 with $150,000 and $350,000 in past and future pain and suffering respectively and $50,000 for loss of services); *Bukowski v. Robert DelaTorre,* Albany Supreme Court Index 6024/91, Mar. 18, 1993 (a 37 year old gas station manager and marathon runner sustained a fracture of the right calcaneus resulting in tearing of the heel pad and an award of 832,640 with $132,000 and $300,000 for past and future pain and suffering respectively); *Madrit v. City of New York,* Kings Supreme Court Index 1954/89, May 21, 1992 (a 43 year old Russian immigrant sustained a bimalleolar ankle fracture requiring open reduction and internal fixation and a second surgery to remove the hardware; verdict which included $200,000 for past pain and suffering and $400,000 for future pain and suffering was reduced to $250,000 total); *Gogonas v. Kashanco Int'l Corp.,* New York Supreme Court Index 230/89, Mar. 27, 1992 (a 56 year old painter suffered a fracture of the right talus and distal fibula requiring an open reduction and internal fixation and multiple fractures of the left lower leg requiring a cane to walk and was unable to return to work, agreed to a $909,000 settlement during jury selection); *Karagiannis v. New York State thruway Authority,* Court of Claims No. 77716, Dec. 18, 1991 (a bridge painter sustained back injuries and a comminuted fracture of the os calcis and was required to undergo a triple arthodesis of the subtalar joint resulting in a total award of $541,422 with $40,000 for past pain and suffering and $175,000 for future pain and suffering); *Be-*

luscak v. State of New York, Binghampton Court of Claims No. 76812, Sept. 27, 1991 (a 22 year old carpenter with a displaced fracture of the os calcis requiring a closed reduction with wires inserted through the skin, successfully recovered and was awarded $15,000 for past pain and suffering and $20,000 for future pain and suffering with the bulk of the $359,112 award designated for loss of future earnings); Gallup v. Tarby's Service Station, Inc., Cayuga Supreme Court Index 89/9068, April 19, 1991 (a 25 year old construction worker sustained a comminuted fracture of the right os calcis, requiring internal fixation and an avulsion fracture of the left medial malleolus causing a limp and additionally suffered a wrist fracture, received a jury verdict of $92,000 for future pain and suffering and $30,000 for past pain and suffering); Araujo v. Williamson Law Book Co., Monroe Supreme Court Index 90/7441, Jan. 18, 1991 (a fifty year old painter with a calcaneal fracture of the foot with possible future ankle fusion surgery recovered $50,000 for pain and suffering and $28,500 medical expenses and $188,500 in economic loss); Tissier v. City of New York, Bronx Supreme Court Index 21858/86, Aug. 14, 1990 (a 38 year old sanitation worker settled for $200,000 after sustaining a comminuted fracture of the heel bone and a chip fracture of the talus resulting in pain on walking and the inability to run and engage in sports); Manning v. British American Dev., Schenectady Supreme Court Index 4269/84, Aug. 10, 1989 (a 32 year old carpenter received a total award of $414,120 with $60,000 in past pain and suffering and $180,000 for future pain and suffering caused by a fracture of the left heel bone with inversion loss and traumatic arthritis in the subtalar joint); Cepeda v. Hertz Corp., New York Supreme Court Index 1771/82, May 11, 1984 (a nineteen year old wrestler with a $5,000,000 total judgment reduced to $750,000 for a trimalleolar fracture and dislocation of the ankle with a separation of the tibial-fibular syndemosis requiring an open reduction and internal fixation); Moffatt v. Arlen Realty Management, Inc., Albany Supreme Court Index 904/82, Mar. 15, 1984 (a male, approximately 25 years old underwent open reduction and insertion of metal plates for a bimalleollar fracture was awarded $750,000, reduced by the court to $500,000); McGrath v. Baranello & Sons, Inc., Kings Supreme Court Index 27102/78, July 22, 1983 (a male employee received a jury verdict of $790,000 for a fracture of the medial malleolus of the left ankle resulting in a permanent limp).

## C. Humerus Injuries

Mrs. Goldstein's sustained tertiary injuries to her humerus and the damages reflected in the following cases are for injuries to the humerus. See Linszer v. Wachsman, 232 A.D.2d 530, 648 N.Y.S.2d 981 (2d Dep't 1996)(affirming jury award of $55,000 for past pain and suffering and $150,000 for future pain and suffering for a plaintiff with a fractured humerus); DeCoufle v. Frederick Benedict, Inc., 93 A.D.2d 805, 460 N.Y.S.2d 604 (2d Dep't 1983) (court offered a new trial on damages or a reduction in the verdict award of $400,000 to $250,000 for a 68 year old plaintiff who sustained a fractured hip, which healed, and a fracture of the head of the humerus resulting in a 50% loss of her shoulder's range of motion); Cooperberg v. City of New York, Kings Civil Court Index 4569/88, Oct. 31, 1990 (a 67 year old retired bookkeeper who was 77 years old when the case was tried sustained a fracture of the right dominant humerus at the greater tuberosity and surgical neck, received an award of $115,000, including $65,000 for past pain and suffering and $50,000 for future pain and suffering); Capuccio v. State of New York, New York Supreme Court Index 43313/82, Mar. 23, 1990 (a 53 year old waitress with a comminuted displaced fracture of the distal shaft of the right (dominant) proximal humerus required immobilization for 6 months, resulting in a partially frozen right shoulder with adhesive capsulitis and post-traumatic stress disorder that caused recurrent depression and nine years of psychiatric care received a jury award of $994,707 including $202,476 for past lost earnings, $250,000 and $500,000 for past and future pain and suffering); Delia v. City of New York, Bronx Supreme Court Index 16324/81, July 20, 1983 (a 44 year old woman with a non displaced fracture of the lesser tuberosity of the right

humerus and an injury to the right brachial plexus received a $450,000 award).

## D. Calculation of Damages

Comparable cases, of course, are utilized to assist the Court as a guide in determining the specific amount of damages a particular plaintiff should recover. Each case must be individually evaluated as the Court attempts to quantify the amorphous qualities of pain and suffering. This process cannot be reduced to a formula consisting of the simple aggregation of separate injuries to determine the final recovery. The plaintiff and her injuries must be taken as a whole in assessing the proper measure of damages.

■ Francine Goldstein has made a remarkable recovery from substantial injuries. However, she still is unable to walk without a cane and faces the distinctly unpleasant probability of at least one knee replacement surgery and most likely a second. She will require physical therapy for the rest of her life or for 26 years, at least once a week at a cost of $100 per session for a total of $130,000.[21] The cost of two knee replacements is $70,000 with an additional ancillary cost of $25,000.[22] It is also likely that the plaintiff will require the removal of the ankle hardware, at an approximate cost of $10,000. A minimum of $235,000 for future surgery and physical therapy is therefore reasonable for all three injuries.

■ Plaintiff Francine Goldstein endured substantial past pain and suffering for the three fracture areas of the right arm and shoulder, the right knee and leg and the right foot. She also underwent internal fixation in two areas and when juxtaposed against the awards described above, her suffering warrants a substantial award for the lower extremity injuries alone. The additional injuries contributed significantly to plaintiff's pain and suffering and also delayed and complicated her recovery because these injuries were all on the same side of her body at different levels. Accordingly, the Court finds that an award of $450,000 for past pain and suffering is reasonable and appropriate.

■ Plaintiff also must live the rest of her life with this continuing disability. The injuries will cause her future pain and suffering and will continue to substantially reduced her quality and enjoyment of life, and accordingly, an award of $230,000 for future pain and suffering is assessed for all the injuries.

## E. Loss of Consortium

■ Mr. Allan Goldstein's loss of consortium claim "embraces such elements as love, companionship, affection, society, sexual relations, solace and more." *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 502, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897 (1968). This cause of action essentially seeks to compensate the interest of the injured party's spouse in "the continuance of a healthy and happy married life." *Id.*, 293 N.Y.S.2d at 310, 239 N.E.2d 897. Based upon the findings of fact recounted *supra*, the Court finds that Mr. Goldstein has been damaged in the amount of $50,000 for the loss of Mrs. Goldstein's services. Three of the cases cited above included awards for loss of services. *See Sheehan* ($110,000); *Danko* ($80,000); and *D'Amico* ($50,000). In the instant action, an amount of $50,000 balances the lack of quality leisure time the Goldsteins shared prior to the accident, with the recognition of the many domestic chores Francine Goldstein did, but can no longer do, to keep the house, and the benefits that Allan

---

**21.** Total physical therapy costs are calculated as follows: Cost of $100 per session, once a week for 50 weeks per year (2 weeks vacation) over 26 years (plaintiff's life expectancy). Although Dr. Saltzman testified that the plaintiff would require physical therapy on an intermittent basis two to three times per week for the rest of her life, the Court concludes that one visit per week for life fairly approximates the actual number of sessions the plaintiff will require.

**22.** Pre and post knee replacement surgery would require ten visits to the orthopedic surgeon for a total of $2,000 for two surgeries. The surgeries would also require an increase in physical therapy to 7 sessions per week for 6 weeks, for an additional $7200, followed by 4 sessions per week for an indeterminate time of up to one year, which the Court estimates at an additional 26 weeks, for an additional $15,600. With other miscellaneous costs involved, the total cost of two knee replacement surgeries will be approximately $95,000.

Goldstein derived from those pre-accident efforts.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court finds for the plaintiffs in the total amount of $965,000. Specifically, plaintiff Francine Goldstein is awarded: (1) $235,000 for future medical costs: (2) $450,000 for past pain and suffering; and (3) $230,000 for future pain and suffering. Plaintiff Allan Goldstein is awarded $50,000 for loss of consortium. The parties are directed to submit a joint proposed Judgment within 30 days of this Order. If the parties cannot reach an agreement, the Court will hold a hearing with respect to the applicability of New York Civil Practice Law and Rules Section 4545 and Article 50–B.

SO ORDERED.