**Donna DiPIRRO and Dennis DiPirro, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 96–CV–94H.**

United States District Court, W.D. New York.

Feb. 26, 1999.

David J. Sleight, Buffalo, NY, for plaintiffs.

Mary Pat Fleming, U.S. Attorney's Office, Buffalo, NY, for defendants.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

The parties have consented to have the undersigned conduct all further proceedings in this case, including trial and entry of final judgment, in accordance with 28 U.S.C. § 636(c). On February 12, 1996, plaintiffs filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, seeking money damages for personal injury in the amount of $400,000.00, and loss of support, consortium and services in the amount of $250,000.00, arising out of a motor vehicle accident that occurred on August 10, 1994. On June 15–26, 1998, a non-jury trial was held before the undersigned. The parties filed post-trial briefs, and closing arguments were heard on December 21, 1998. The following constitutes the court's findings of fact and conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

Based on a preponderance of the credible evidence presented at trial, I find that the injuries complained of by Mrs. DiPirro were caused, precipitated or aggravated by a combination of trauma from the impact of the August 10, 1994 accident, her predisposition to carpal tunnel or rotator cuff injury established by her several preexisting medical conditions, and possible latent residual effects of other recent trauma to her ribs, neck and back. I also find that

Mrs. DiPirro's medical condition caused her to be totally disabled from returning to her past work as manager of Pizza DiPirro from August 10, 1994 through January 5, 1998, but not thereafter. I find that defendant is liable for Mrs. DiPirro's economic loss beyond $50,000.00, and for plaintiffs' non-economic loss including Mrs. DiPirro's damages for past pain and suffering and Mr. DiPirro's damages for loss of support, consortium and services, in the total amount of $54,000.00.

### FINDINGS OF FACT

The following facts are undisputed. On August 10, 1994, Donna DiPirro was driving a 1986 Chrysler New Yorker south on Union Road in the Town of Cheektowaga, New York. The Chrysler was owned by Dennis DiPirro, Donna DiPirro's husband. Mrs. DiPirro was 55 years old at the time. The weather was clear and dry.

At approximately 9:55 a.m., as Mrs. DiPirro approached William Street a 1989 Grumman "Long Life" vehicle, owned by the United States Postal Service ("USPS") and driven by USPS employee Daniel Czuprynski, pulled out of a driveway at 2730 Union Road and struck the Chrysler on the right rear passenger door and quarter panel. The Chrysler sustained property damage in the amount of $929.72, and the postal vehicle sustained property damage in the amount of approximately $300.00 (*see* Item 50; *see also* Deft.Ex. D).

Later that morning, Mrs. DiPirro was treated at St. Joseph's Hospital. She complained of headache and pain throughout her right side, as well as numbness of her right wrist. She denied any trauma to her head or chest. She underwent an x-ray of her cervical spine, which showed some degenerative changes including sclerosis and narrowing and spurring at several apophyseal joints of the cervical spine, most pronounced at the C5–C6 level on the left. The x-ray showed no evidence of fracture or dislocation. Mrs. DiPirro was diagnosed with whiplash syndrome and cervical strain. She was given a soft cervical collar

and pain medication, and was released at 1:40 p.m. (Deft.Ex.U). On June 13, 1995, she underwent carpal tunnel release surgery of her right hand, performed by Dr. Andrew Giacobbe (Item 50, ¶ 17; Item 59, p. 1096).

The disputed facts were presented at the trial by way of witness testimony and numerous exhibits. Mrs. DiPirro testified at the trial, along with her husband Dennis DiPirro. The following witnesses also testified for plaintiffs: Timothy DiPirro, plaintiffs' son, who also works at Pizza DiPirro and who transported Mrs. DiPirro from the scene of the accident to St. Joseph's Hospital; Dr. Robert LaMantia, Mrs. DiPirro's primary care physician; Dr. Stephen Zajac, Dr. Pratibha Bansal, and Dr. Craig Chertak, all of whom rendered various types of medical treatment to Mrs. DiPirro following the August 10, 1994 accident; and Dr. Giacobbe, who performed the carpal tunnel release surgery.

The following witnesses testified for defendant: Sgt. Mark Petruniak, the Town of Cheektowaga police officer who responded to the accident; Mr. Czuprynski, the driver of the USPS vehicle involved in the accident; Daniel Markey, the USPS investigator who responded to the accident; Richard Hermance, an accident reconstructionist retained by defendant as an expert witness; Dr. Leon Kazarian, a biomechanical engineer retained by defendant as an expert witness; Dr. Elizabeth Roehmholdt, a neurologist retained by defendant as an expert witness; Dr. Goeffrey Gerow, a chiropractor who performed an independent medical examination of Mrs. DiPirro at the request of her no-fault insurance carrier; Dr. Thomas Pastore, an orthopedist who also performed an independent medical examination of Mrs. DiPirro at the request of her no-fault insurance carrier; Dr. Michael Feinberg, an orthopedic hand specialist retained by defendant as an expert witness; Joseph Higgins, an occupational therapist who performed a functional capacity assessment of Mrs. DiPirro; and Patrick O'Connor, a

physical therapist who treated Mrs. DiPirro following the accident.

The preponderance of the testimony and documents admitted as proof at trial establishes that, at the time of the accident on August 10, 1994, Mrs. DiPirro was driving south in the right-hand lane on Union Road. She was on her way to work at Pizza DiPirro, a family-owned business where she had worked for fourteen years. As she approached the William Street intersection, she was traveling at a speed of approximately 25 miles per hour. She entered the right-hand turning lane, and noticed the postal vehicle in the driveway at 2730 Union. She did not see the postal vehicle move as she approached William Street. As she passed the postal vehicle, she felt the impact of the collision at the rear of her car. The impact caused her car to change direction, and it eventually came to rest on the right-hand side of Union Road, off the street. She got out of her car, feeling "groggy." She approached Mr. Czuprynski, the driver of the postal vehicle. Mr. Czuprynski asked her to sign something, but she refused. She told him that her wrist hurt (Item 52, pp. 43–58).

Mrs. DiPirro called her husband Dennis from the accident scene. She told him that she would not be in to work because she had been in an accident. Dennis DiPirro called their son Timothy, who arrived at the accident scene shortly thereafter. Cheektowaga Police Officer Mark Petruniak and USPS Inspector Daniel Markey also arrived at the scene shortly after the accident. Officer Petruniak asked Mrs. DiPirro if she was injured. She told him that she did not feel good, and that her hand hurt. He asked her if she needed an ambulance. Timothy told the officer that he would take Mrs. DiPirro to the hospital (id., pp. 58–63).

Timothy took Mrs. DiPirro to the emergency room at St. Joseph's Hospital. Mrs. DiPirro told emergency room personnel that she had pain in her arm, neck and upper back. She was placed in a cervical collar and received a shot for pain. She

was released, and went home to bed. The next day she felt pain in her head, shoulder blades, upper back and right arm. She called Dr. Robert LaMantia, her primary care physician, but could not get an appointment until August 22, 1994 (id., pp. 63–65; Deft.Ex. V., p. 200).

Dr. LaMantia was Mrs. DiPirro's primary care physician from January 1987 until December 1996. She has a history of insulin-dependent diabetes dating back to the late 1970's, and a long (30+ year) history of hyperthyroidism and hypertension. Prior to the August 1994 accident, she suffered from several complications of these conditions, including cellulitis of the left foot (requiring surgical removal of two toes), diabetes ketoacidosis (an acute condition requiring hospitalization), diabetic retinopathy (changes in the back of her eye), and obesity. She also had mild degenerative changes and mild osetophytic spurring in her thoracic spine prior to the August 1994 accident.

During an office visit on January 18, 1993, Mrs. DiPirro reported that she had fallen on her right side ten days earlier. She was x-rayed at Mercy Hospital. Dr. LaMantia's diagnosis at that time was diabetes and rib fracture (Deft.Ex.V, p. 207). There was no indication of complaints about injuries to her shoulder, wrist, hand or back. Records from Mercy Hospital dated January 14, 1993 indicated that Mrs. DiPirro had suffered a nondisplaced fracture of the right third rib without evidence of underlying pulmonary disease (id., pp. 174–75). During subsequent visits on January 20, 1993 and July 13, 1993, Mrs. DiPirro did not complain about her rib injury (Item 53, pp. 223–31).

On October 1, 1993, Dr. LaMantia saw Mrs. DiPirro for neck pain and possible whiplash associated with a driving incident in which her husband made an evasive move to avoid another car. His notes for that day contain a reference to a back problem associated with a 1981 bicycle accident. There was no indication of pain in

her right wrist or shoulder. Dr. LaMantia ordered an x-ray of Mrs. DiPirro's neck and upper spine, which showed very mild cervical spondylosis involving C5–C6, with minimal osteophytic spurring of the thoracic spine. He prescribed heat and anti-inflammatory and muscle relaxant medication. On October 18, 1993, the left side of her neck was still sore. The medication had helped. Dr. LaMantia testified that, in his opinion, Mrs. DiPirro had shown improvement, but she still had some discomfort. He continued her prescription for anti-inflammatory medication (Item 53, pp. 231–39).

On May 6, 1994 Dr. LaMantia saw Mrs. DiPirro after she fell on her kitchen floor. His diagnosis was diabetes with trauma. There was tenderness in the lower thoracic spine, ribs and under the left armpit. There was no indication of injury to her right shoulder or right hand. X-rays from Mercy Hospital indicated left rib sprain contusion. On May 24, 1994, she still had pain in her left ribs, and her back had improved. He prescribed Tylenol with codeine # 3. There was no indication of pain in her right hand, wrist or shoulder (*id.*, pp. 241–48).

When Dr. LaMantia saw Mrs. DiPirro on August 22, 1994, twelve days after the accident at issue, she complained of pain in her right shoulder, right wrist and neck. Upon examination, her neck range of motion was sixty percent in all directions. Shoulder range of motion was normal, with tenderness in the right scapula. There was mild swelling in the ulnar aspect of her wrist and in the fourth and fifth fingers. Dr. LaMantia prescribed pain medication and ordered x-rays of the right scapula, right wrist and right hand. The x-rays showed no fractures, dislocations, bony abnormalities or arthritic changes. The impression was normal right scapula,

normal right wrist and normal right hand (*id.*, pp. 253–59; Deft.Ex. V., pp. 93, 200).

Dr. LaMantia saw Mrs. DiPirro on several occasions between August 1994 and December 1996. Mrs. DiPirro continued to have pain in her right shoulder, arm, hand, wrist and back. At times the pain was severe, and at times spasmodic. Dr. LaMantia testified that, in his opinion, Mrs. DiPirro's complaints relating to her right shoulder, arm, hand and wrist were causally related to the motor vehicle accident on August 10, 1994. According to Dr. LaMantia. Mrs. DiPirro "had some neck issues prior to this point …" (Item 53, p. 256), but the shoulder, arm, hand and wrist complaints were new. Dr. LaMantia testified that, over the course of his ten-year treatment of Mrs. DiPirro, he never found her to be a complainer and she tolerated a significant amount of pain (Item 53, pp. 263–74).

In October 1994, Dr. LaMantia referred Mrs. DiPirro to Dr. Michael Geraci[1] at Buffalo Spine and Sports Medicine, P.C., for an electrodiagnostic study, which was conducted on October 28, 1994. Dr. Geraci's impression was bilateral median sensorimotor neuropathy consistent with mild carpal tunnel syndrome (Pltff.Ex.22). Carpal tunnel syndrome is a condition in which the median nerve passing through the wrist becomes compressed, causing symptoms of numbness or dysfunction in the central part of the hand (*see* Item 53, p. 302). Dr. Geraci referred Mrs. DiPirro for physical therapy and, when this treatment proved unsuccessful, Dr. Geraci referred Mrs. DiPirro to Dr. Andrew Giacobbe for surgical assessment.

On November 30, 1994, Dr. Thomas Pastore performed an independent medical examination of Mrs. DiPirro at the request of her insurance carrier. Mrs. DiPirro complained of pain in her right wrist, hand and shoulder, as well as her neck and upper

---

1. Dr. Geraci was listed by plaintiffs as a witness to testify at trial regarding the treatment he provided to Mrs. DiPirro between approximately October 1994 and September 1995.

Dr. Geraci was not called as a witness at trial, and defendant has requested the court to draw an adverse inference from his absence. This request is addressed in the text *infra*.

back. Dr. Pastore testified that, based on his examination of Mrs. DiPirro and his review of her medical history, in his opinion some of her shoulder pain was the result of the August 10, 1994 accident, but most of it was from arthritic changes. According to Dr. Pastore, arthritis is the most common cause of rotator cuff injury. In his opinion, Mrs. DiPirro had a preexisting arthritic condition which was compounded by the accident. His final diagnosis was contusion of the neck, right shoulder, right wrist and right hand due to the August 10, 1994 accident. He found no evidence of major injury that would prevent Mrs. DiPirro from returning to work as a pizzeria manager as of the date of his examination of her (Item 57, pp. 890–918). At the time of his diagnosis, Dr. Pastore was not aware of the injuries suffered by Mrs. DiPirro prior to the August 1994 accident (id., pp. 932–33).

Patrick O'Connor, a board-certified orthopedic physical therapist, began treating Mrs. DiPirro in November 1994 upon referral from Dr. Geraci. Mr. O'Connor treated Mrs. DiPirro on approximately fifty-one occasions from November 3, 1994 to March 3, 1995. She initially complained of pain in her entire upper right quadrant. At the time of his last treatment of Mrs. DiPirro, she had better range of motion in her neck and a general decrease in pain, but still had dull aches in her scapular area and upper trapezius. Mr. O'Connor testified that, in his opinion, Mrs. DiPirro could return to work as a pizzeria manager as of March 3, 1995, but he requested a residual functional capacity assessment to objectify her continued complaints (Item 57, pp. 981–1012).

The functional capacity evaluation was performed on March 21, 1995 by Joseph Higgins, an occupational therapist and a certified vocational evaluation and work adjustment specialist. Mr. Higgins testified that, in his opinion, Mrs. DiPirro could return to work as of the date of his evaluation, with some limitation of physical function (Item 57, pp. 941–73). On cross-ex-

amination, Mr. Higgins testified that he saw Mrs. DiPirro on just one occasion, and had no way of knowing whether her physical limitations deteriorated after March 1995. She could use her right hand and arm to do occasional, close-to-the-body activity, and she could use her left hand and arm to offset her limited tolerance of right-handed activity (id., pp. 973–79).

Dr. Giaccobe first saw Mrs. DiPirro on May 22, 1995. Mrs. DiPirro complained of pain in her right hand since the August 1994 accident, as well as pain in the right wrist, index, middle and ring fingers. Upon examination, Dr. Giacobbe found irritation of the right median nerve, indicating carpal tunnel syndrome. Testing was negative for carpal tunnel syndrome on her left side. His diagnosis was right carpal tunnel syndrome of moderate severity, with failure of conservative treatment. He recommended right carpal tunnel release surgery (Item 59, pp. 1082–90).

Based on his examination of Mrs. DiPirro and his review of Dr. Geraci's electrodiagnostic report and other medical records, Dr. Giacobbe formed the opinion that Mrs. DiPirro's right side carpal tunnel syndrome was caused by the trauma of the August 10, 1994 motor vehicle accident. He testified that, in general, during a motor vehicle accident the patient is gripping the steering wheel and on impact is driven forward, causing hyperextension of the wrists and eventual swelling or bruising in the carpal tunnel area. A minimal amount of swelling, which may not be visible either on the outside of the wrist or in an x-ray, can result in carpal tunnel syndrome (id., pp. 1090–96).

On June 13, 1995, Dr. Giacobbe performed the carpal tunnel release surgery on Mrs. DiPirro. He felt that the surgery was successful in removing the numbness and tingling in Mrs. DiPirro's right hand. However, she continued to have complaints of pain in the outer aspect of her right hand and in the right little finger. Dr. Giacobbe ordered another nerve conduction study, performed on September 25,

1995, which showed improved function of the median nerve after surgery and no indication of ulnar neuropathy. He saw her in October 1995, and concluded that Mrs. DiPirro's continued complaints of pain in her right hand were musculoskeletal, with some arthritis. He saw her again in April 1996. She continued to have numbness and tingling in the right ulnar nerve distribution, which includes the ring and little finger. Dr. Giacobbe concluded that Mrs. DiPirro had mild right cubital tunnel syndrome, which is nerve irritation at the level of the elbow. He noted that she also had diabetes. The condition was not severe enough to warrant surgery. He had no opinion as to whether the cubital tunnel syndrome was caused by the August 10, 1994 accident (*id.*, pp. 1096–1108).

On cross-examination, Dr. Giacobbe testified that in order for a person's wrists to become violently hyperextended during a motor vehicle accident, there would have to be sufficient force (*id.*, p. 1121). He testified that the presence of bilateral carpal tunnel syndrome did not necessarily indicate that the condition predated the accident. According to Dr. Giacobbe, it was possible that some degree of carpal tunnel syndrome was present before the accident, and that the carpal tunnel condition was associated with Mrs. DiPirro's diabetes. However, he concluded that the accident "certainly brought on a condition which may not have been symptomatic before" (*id.*, pp. 1124–25). He testified that Mrs. DiPirro's history of diabetes and hyperthyroidism, as well as her gender and her age, could have increased her chances of having carpal tunnel syndrome (*id.*, pp. 1131–32). When he last examined Mrs. DiPirro in April 1996, she had no residual effects of carpal tunnel syndrome (*id.*, p. 1137).

On October 26, 1995, Dr. Goeffrey Gerow performed an independent medical examination of Mrs. DiPirro at the request of her insurance carrier. Based upon his examination and Mrs. DiPirro's medical history, Dr. Gerow was of the opinion that Mrs. DiPirro suffered cervical dorsal strain and sprain and myalgia as a result of the August 10, 1994 accident. He determined that Mrs. DiPirro had a mild partial disability, but could return to work as a pizzeria manager as of the date of the examination (Item 55, pp. 577–612).

From April 1995 to June 1996, Mrs. DiPirro was treated at Suburban Chiropractic by Dr. Gary Wright. In June 1986, when Dr. Stephen Zajac took over her treatment, she was "significantly, permanently, partially disabled" (Item 52, p. 114). She had no significant musculoskeletal complaints prior to the August 10, 1994 accident, but had developed major musculoskeletal problems since. Myofascia damage—*i.e.*, soft-tissue injury—far exceeded initial findings. Her condition was severely chronic. In Dr. Zajac's opinion, when Mrs. DiPirro left treatment with Suburban Chiropractic in September 1996, she was still permanently disabled from her work as manager of a pizzeria (*id.*, p. 114–18; Govt.Ex. EE).

Dr. LaMantia last saw Mrs. DiPirro in December 1996. She continued to have pain in her right arm, wrist, back and neck. Dr. LaMantia referred her to Dr. Joseph Buran, an orthopedic specialist at the University of Buffalo Sports Medicine Institute. Dr. Buran saw Mrs. DiPirro in January and February 1997. He diagnosed bone spurs and a rotator cuff tear in Mrs. DiPirro's right shoulder, and requested authorization for an MRI to confirm his diagnosis (*see* Deft.Ex. AA). Mrs. DiPirro's health insurance would not pay for the MRI.

On March 31, 1997, Mrs. DiPirro was examined by Dr. Craig Chertak, an orthopedic surgeon. Dr. Chertak also recommended a right shoulder MRI, which was taken in April 1997. The MRI showed evidence of arthritis and partial rotator cuff tear (*see* Deft.Ex. DD). Dr. Chertack recommended decompression surgery to remove bone spurs and fragments, and to

repair the partial rotator cuff tear. Mrs. DiPirro did not have the surgery.

In Dr. Chertak's opinion, based on Mrs. DiPirro's asymptomatic report from before the August 1994 accident, the rotator cuff tear most likely occurred at the time of the accident. He also testified that the pain she was having in her hand and arm, and possibly even her symptoms of carpal tunnel disease, could have been secondary to the damage to her shoulder, as well as nerve damage, caused by the August 1994 motor vehicle accident (Item 55, pp. 649–70). On cross-examination, Dr. Chertack testified that the x-rays of Mrs. DiPirro's right shoulder, taken on August 22, 1994, showed evidence of arthritic changes predating the August 10, 1994 accident. He also testified that he was not aware of Mrs. DiPirro's history of previous injuries suffered in January and October 1993, and in May 1994. He testified that aging, arthritis, or any one of the previous injuries could have contributed to Mrs. DiPirro's right shoulder problem, but without MRI or arthroscpopy at each stage of development it was impossible to attribute percentages (*id.*, pp. 674–701).

Dr. Chertack referred Mrs. DiPirro to Dr. Pratibha Bansal at the Pain Rehab Center of WNY. Dr. Bansal first saw Mrs. DiPirro on June 12, 1997. Mrs. DiPirro complained of pain in her upper back, shoulder, neck, head and right wrist. Upon examination, Dr. Bansal's diagnosis was arthritis involving the acromion clavicular joint with some impingement and considerable myofascial pain involving the neck, shoulder, back and temporomandibular joint. She recommended physical therapy and a TENS unit. She saw Mrs. DiPirro again on several occasions between July 9, 1997, and December 2, 1997, and administered trigger point injections to various muscles in Mrs. DiPirro's back (Item 54, pp. 535–56; Deft.Ex. CC).

On October 27, 1997, Dr. Mary Elizabeth Roehmholdt performed an independent neurologic examination of Mrs. DiPirro. Dr. Roehmholdt testified that, in her opinion, Mrs. DiPirro's bilateral carpal tunnel syndrome was related to her diabetes and weight problems, and was not the result of trauma associated with the August 10, 1994 accident.[2] Dr. Roehmholdt concluded that Mrs. DiPirro suffered soft tissue injury as a result of the August 1994 accident, and that Mrs. DiPirro was able to return to work as a pizzeria manager as of the October 27, 1997, the date Dr. Roehmholdt conducted her examination (Item 54, pp. 359–411).

On November 3, 1997, Dr. Michael Feinberg performed an independent medical examination of Mrs. DiPirro. Dr. Feinberg is a board-certified orthopedic surgeon, specializing in hand problems. He is the founder and director of the Hand Clinic at Buffalo General Hospital. Upon examination, Mrs. DiPirro complained of intermittent pain in her right little finger, thumb and wrist, as well as a "funny bone" sensation in her right elbow. Based on his examination of Mrs. DiPirro and his review of her medical history, Dr. Feinberg could find no objective cause for her complaints. He testified that, generally, there are several causes of carpal tunnel syndrome, including acute trauma to the median nerve or its overlying structures, repetitive trauma and cumulative stress from occupational causes, and inflammation of underlying diseases such as rheumatoid arthritis. He testified that there are also cases of predisposition to carpal tunnel injury based on general conditions such as diabetes mellitus, hormonal problems, acromelagy, hyperthyroidism, smoking, obesity and systemic swelling. In Dr. Feinberg's opinion, Mrs. DiPirro had no residual effects of carpal tunnel syndrome, and he could find no objective evidence for her subjective complaints (Item 58, pp. 1027–52).

---

2. Plaintiff moved to strike Dr. Roehmholdt's opinion testimony with respect to whether trauma caused Mrs. DiPirro's carpal tunnel syndrome as beyond the scope of her expert report. The court's ruling on this motion, reserved at trial, is discussed *infra* in the text.

Based on this evidence, I find that the damage to the vehicles sustained during the August 10, 1994 accident, while not particularly extensive, is consistent with a finding that Mrs. DiPirro experienced some trauma as a result of the impact causing soft tissue injury to her right side. The medical evidence shows that Mrs. Di-Pirro was asymptomatic for traumatic right shoulder, arm, wrist and hand injuries prior to the accident, and that she increasingly developed pain and functional problems subsequent to the accident. Her treating physicians testified that even slight swelling, which could be caused by soft tissue damage or hyperextension suffered while gripping the steering wheel during the impact of an automobile accident, could impinge on the nerves in the arm resulting in the eventual degeneration of the wrist and shoulder joints, as evidenced by Mrs. DiPirro's post-accident x-rays and MRI studies.

The government relies heavily on the expert testimony and reports of accident reconstructionist Richard Hermance and biomechanical engineer Leon Kazarian to argue that the contact between the vehicles was a minor, lateral "grazing" and therefore could not have caused Mrs. DiPirro to suffer the injuries complained of. However, I do not find the evidence presented by these experts reliable, for a number of reasons. First of all, Mr. Hermance's accident reconstruction analysis is inconsistent with the photographs. The photographs clearly show that the contact between the vehicles was of sufficient force and velocity to cause considerable impact impressions or dents to the Chrysler's right rear passenger door and quarter panel, as well as some minor damage to the postal vehicle's front left bumper, fender, and pot-lid mirror.

In addition, both of the drivers involved in the accident testified that the Chrysler changed direction as a result of the collision. Mrs. DiPirro testified that she was traveling at a speed of about 25–30 miles per hour at the time of the impact, and that the force of the contact caused her vehicle to change direction. Mr. Czuprynski also testified that Mrs. DiPirro's vehicle came to rest facing north. This eyewitness testimony contradicts the testimony of Mr. Hermance that the impact did not cause a change in the direction of the Chrysler.

Furthermore, Mr. Hermance's accident reconstruction analysis was based primarily on his interpretation of the photographic evidence and his visit to the scene more than three years after the accident. He did not interview Mrs. DiPirro, nor did he have the opportunity to conduct a first-hand inspection of the vehicles. Likewise, Dr. Kazarian's biomechanical analysis was based in large part on Mr. Hermance's accident reconstruction report, and is also contradicted by a preponderance of the photographic and testimonial evidence.

On the other hand, Mrs. DiPirro's testimony was inconsistent, and not credible, as to the movement of both her car and her body during the collision. She testified that the impact caused her car to be pushed into the adjacent lane, changing the direction of her travel from southbound to facing west. She also testified that, at the same time, the postal vehicle was jammed into the back door of her car, and that her car was rocked back and forth several times as Mr. Czuprynski attempted to separate the vehicles. According to Mrs. DiPirro, her car "wound up on two wheels" as a result of the impact (*id.*, p. 55).

She testified that she was wearing her seat belt and shoulder harness, and that the impact with the postal vehicle caused her body to become jammed between the steering wheel and the driver's side door of the Chrysler. According to Mrs. DiPirro, as Mr. Czuprynski attempted to free the vehicles, her body shifted back and forth striking various parts of the Chrysler's interior. She stated that she hit her hands on something, but could not recall what. She could not recall whether she hit her right shoulder on anything. She stat-

ed variously that, during the course of the collision, she lost consciousness, she became wedged between the steering wheel and the door, and at some point ended up on the floor. She testified that she hit her head on the steering wheel or the dashboard, and temporarily blacked out. When she awoke, her head was leaning on the horn.

This testimony is inconsistent with the preponderance of the credible evidence. For example, the photographs of the vehicles and the accident scene show that while the impact of the collision was something more than a "grazing," it was not significant enough to cause Mrs. DiPirro to be thrown violently about the front seat area of her car in the manner in which she testified (*see* Deft.Exs. A–4 through A–11). The impact produced a considerable dent in the rear passenger door of Mrs. DiPirro's car, but only minor damage to the postal vehicle. There were no "skid" or "yaw" marks visible in the photographs of the accident scene (Deft.Exs. A–1, A–2).

This interpretation of the evidence is supported by Mr. Czuprynski's testimony that he was traveling no more than two or three miles per hour as he pulled out of the driveway. He applied the brakes on contact. The contact lasted "a couple seconds." He testified that neither the postal vehicle nor his body moved at all as a result of the contact between the vehicles. He did not feel any forward motion. He did not have to exert any pressure on the steering wheel to prevent his body from moving forward. He did not feel any pressure from his lap belt, or any other movement in his seat. He could not recall having any difficulty releasing the two vehicles. He observed Mrs. DiPirro's vehicle travel about fifteen or twenty feet from the point of contact to where it came to rest on the grass, facing north (Item 56, pp. 715–25).

In addition, Mr. Czuprynski's testimony is supported by the testimony of both Sgt. Petruniak and Mr. Markey. Upon review of the photographic evidence (Deft.Exs. A,

B), Sgt. Petruniak recalled that the August 10, 1994 incident was a "garden variety accident" (Item 52, p. 23). He completed an accident report on the form used for "property only" accidents, since neither party complained of injury (*id.*, pp. 21, 30–31). Mr. Markey, the USPS customer service supervisor who responded to the accident and took the photographs in evidence, testified that Mrs. DiPirro told him she had a "tingle" in her right arm, but she did not request first aid. Mrs. DiPirro told Mr. Markey that she was wearing her seat belt. She drove her vehicle away after the accident. Mr. Czuprynski was uninjured in the accident (*see* Deft.Ex. D; Item 55, pp. 628–38).

Accordingly, based on a preponderance of the credible evidence presented at trial as to how the accident occurred, and considering the medical evidence provided by several treating physicians connecting Mrs. DiPirro's symptoms to the occurrence, I find that the impact of the collision was sufficient to cause Mrs. DiPirro to suffer soft tissue injury to her right shoulder, arm, wrist and hand. However, there is no medical evidence to show that she suffered any direct blunt traumatic injury during the August 10, 1994 accident that would, by itself, have caused or precipitated her carpal tunnel or rotator cuff conditions. She did not complain about right-side trauma either at the accident scene or when she arrived at St. Joseph's emergency room. The emergency room records show no evidence of wrist, arm or shoulder fractures or bruises, and no x-rays were taken of her right arm.

In addition, the preponderance of the medical evidence establishes that Mrs. DiPirro had several medical problems before the August 10, 1994 accident. For example, Mrs. DiPirro had a long history of insulin-dependent diabetes mellitus, hyperthyroidism, high blood pressure, arthritis and weight control problems. According to the testimony of virtually all of the physicians who either treated Mrs. DiPirro or conducted independent medical exami-

nations, every one of these conditions can be an underlying or contributing cause of carpal tunnel syndrome. Mrs. DiPirro also had a history of at least three traumatic injuries to her back, neck and rib cages bilaterally in the twenty months prior to the August 10, 1994 accident. Based on this undisputed medical evidence, it is reasonable to conclude that her preexisting medical conditions contributed to the severity of the symptoms that she developed subsequent to the accident.

Accordingly, I find that Mrs. DiPirro's right-side carpal tunnel and rotator cuff injuries were ultimately caused, precipitated or aggravated by a combination of the trauma from the impact of the August 10, 1994 accident, her predisposition to carpal tunnel or rotator cuff injury established by her several preexisting medical conditions, and possible latent residual effects of other recent trauma to her ribs, neck and back.

I also find it reasonable to conclude from a preponderance of the evidence in this case that Mrs. DiPirro's medical condition caused her to be totally disabled from returning to her past work as manager of Pizza DiPirro from August 10, 1994 through January 5, 1998, but not thereafter. The testimony and reports of Mrs. DiPirro's treating physicians, chiropractors and therapists varied widely with respect to the severity and permanency of her right-side injuries and her overall medical condition. This evidence, along with the testimony and reports of defendant's consultative experts, provide conflicting proof of Mrs. DiPirro's functional capacity to perform the tasks required of her job, and inconsistent opinions as to whether, and when, Mrs. DiPirro was able to return to work. However, none of her treating physicians, chiropractors or therapists, and none of defendant's medical experts, testified or reported that Mrs. DiPirro's disability was total and permanent as of the time of trial, or even as of

the time that she returned to work on a part-time volunteer basis.

The undisputed proof at trial shows that Mrs. DiPirro's right-side carpal tunnel syndrome was corrected by surgery and, according to Dr. Giacobbe, the problem had resolved by April 1996. The partial rotator cuff tear was diagnosed by Dr. Chertack in March 1997. Corrective surgery was recommended, but not pursued. At the time of trial, Mrs. DiPirro was not under medical care for the injuries she suffered as a result of the August 1994 accident, and she was not taking pain medication. She was able to take care of most of her daily needs. She was able to drive, dress herself, and do some cooking, cleaning and laundry. Sexual relations with her husband had resumed. She testified that she returned to work at Pizza DiPirro in January 1998 on a part-time volunteer basis. She also testified that she had been depressed since the August 1994 accident, but she did not seek treatment for depression.

Accordingly, I find that Mrs. DiPirro was totally disabled from work between August 10, 1994 and January 5, 1998 (the first full workday after the holidays), but not thereafter.

### CONCLUSIONS OF LAW

**I. Plaintiffs' Motion to Strike Dr. Roehmholdt's Testimony.**

■ At trial, plaintiffs moved to strike Dr. Roehmholdt's opinion testimony regarding whether trauma caused Mrs. DiPirro's carpal tunnel syndrome. Plaintiffs argued that this opinion is beyond the scope of Dr. Roehmholdt's expert report (Item 54, pp. 459–61). The court reserved its decision on plaintiffs' motion to strike.[3]

■ Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires a party that intends to use an expert witness at trial to provide its adversary with a writ-

---

3. The government briefed this issue in its Proposed Findings of Fact and Conclusions of

law (Item 63, pp. 67–78), but plaintiffs did not.

ten report prepared by the witness, setting forth "a complete statement of all opinions to be expressed and the basis and reasons therefor...." Rule 26(e)(1) imposes a continuing duty to disclose, at least 30 days prior to trial, any additions or changes to the expert report, or to any deposition testimony given by the expert witness. The primary reasons for these strict reporting and supplementation requirements are to eliminate unfair surprise to the opposing party and to avoid unnecessary discovery costs. *Elgas v. Colorado Belle Corp.,* 179 F.R.D. 296, 298 (D.Nev.1998); *Reed v. Binder,* 165 F.R.D. 424, 429 (D.N.J.1996).

 In addition, Rule 37(c)(1) provides:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness or information not so disclosed.

Precluding expert testimony under this rule is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard for the requirements of Rule 26(a)(2)(B). *McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 587 (W.D.N.Y.1995). Thus, preclusion of expert opinion testimony is generally ordered only where the court finds that the party's failure to comply with the requirements was both unjustified and prejudicial. *McNerney, supra; Hinton v. Patnaude,* 162 F.R.D. 435, 439 (N.D.N.Y.1995); *see also Kolt v. United States,* 1998 WL 214826 (W.D.N.Y. April 24, 1998) (psychiatrist's deposition testimony "did not so contradict his written report or his testimony at trial as to mislead" other party regarding expert opinion rendered at trial).

In this case, defendant submitted Dr. Roehmholdt's 14–page report of her October 27, 1997 independent medical examination of Mrs. DiPirro as Dr. Roehmholdt's written report under Rule 26(a)(2)(B) (Deft.Ex. M). In her report, Dr. Roehmholdt stated her opinion, which was based upon her examination and her review of Mrs. DiPirro's extensive medical records, as follows:

Mrs. DiPirro would be able to resume many of the activities associated with managing the pizza restaurant which she had done prior to the accident. The accident involved soft tissue injury which would be responsive to physical therapy, weight reduction, and increased daily activities. From the review of her records she has shown marked improvement over a relatively short period of time, two years after the accident. It is expected for her to continue to improve provided she continues with her exercise program, begins serious weight reduction and that she have good management of her diabetes and its complications which Dr. Michotek, her primary physician, has already begun to address.

(*Id.,* p. 14). Dr. Roehmholdt also made the following findings based on her review of Mrs. DiPirro's medical records:

Mrs. DiPirro has a long-standing history of diabetes for which she had been on insulin at the time of the accident. She had started to develop complications of her diabetes as early as 1987.... She also had, by the time of her motor vehicle accident, developed hypertension for which she was [taking] medication.... In addition to her preexisting diabetes and its multiple complications, Mrs. DiPirro had been involved in three injuries in a relatively short period of time preceding the motor vehicle accident.... She has a remote history of a back problem in 1981 with a flare-up of that back problem in 1991. At the time of her accident x-rays were taken which revealed degenerative changes in the cervical spine. Mrs. DiPirro was found to have bilateral Carpal Tunnel for which she underwent surgical release and had a relatively good result. It should be noted that obesity and diabe-

tes are predisposing causes of Carpal Tunnel Syndrome.

(*Id.*, p. 13).

At trial, Dr. Roehmholdt testified that carpal tunnel syndrome could be caused by trauma, but that hyperextension of the hand or wrist would not be the type of trauma that would ordinarily cause it (Item 54, pp. 402–06). She testified that, in her opinion, Mrs. DiPirro did suffer soft tissue injury as a result of the August 10, 1994 accident, but that Mrs. DiPirro's carpal tunnel syndrome was "related to her diabetic condition" and that "obesity can also be a factor" (*id.*, pp. 405–06). On cross-examination, Dr. Roehmholdt testified that Mrs. DiPirro's carpal tunnel syndrome was not caused by trauma associated with the accident (*id.*, p. 424).

I find that the information provided in Dr. Roehmholdt's report was sufficient to put plaintiffs on notice as to the substance of the opinion testimony she offered at trial—*i.e.*, that Mrs. DiPirro's carpal tunnel syndrome was caused not by the trauma of the accident alone, but by a combination of factors, including soft tissue injury suffered during the accident and preexisting diabetes and obesity. While it is true that Dr. Roehmholdt's report does not specifically state that she would render an opinion at trial as to whether trauma caused Mrs. DiPirro's carpal tunnel syndrome, the report clearly indicates the doctor's awareness of Mrs. DiPirro's long history of weight problems and diabetes, and the general opinion that obesity and diabetes are predisposing causes of carpal tunnel syndrome. This information is sufficient to alert plaintiff's counsel to the possibility that, when cross-examined about the cause of Mrs. DiPirro's carpal tunnel condition, Dr. Roehmholdt might have an opinion as to the role played by trauma.[4]

I also find that plaintiffs have suffered no prejudice as a result of the court's consideration of Dr. Roehmholdt's trial testimony. As evidenced by the factual findings set forth above, the preponderance of the proof at trial established that Mrs. DiPirro did suffer some injury as a result of the trauma that she experienced during the August 10, 1994 accident, and that the trauma was a contributing cause of Mrs. DiPirro's symptoms.

Finally, plaintiffs have made no showing to suggest that the government should be charged with flagrant bad faith and callous disregard for the requirements of Rule 26(a)(2)(B).

Accordingly, plaintiffs' motion to strike Dr. Roehmholdt's opinion testimony is denied.

## II. Applicable Law: Federal Tort Claims Act/New York State Law.

■ Pursuant to the Federal Tort Claims Act, the federal government has consented to be sued for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Therefore, since the accident in question occurred in New York, the issues of liability and damages are to be determined under New York law. *Goldstein v. United States*, 9 F.Supp.2d 175, 186 (E.D.N.Y. 1998); *Bekiaris v. United States*, 1998 WL 418917, at *5 (S.D.N.Y. July 23, 1998).

### A. Liability.

■■ Under New York's Vehicle and Traffic Law, "[t]he driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right of way to all vehicles

---

4. On cross-examination by plaintiffs' counsel, Dr. Roehmholdt testified as follows:

 Q: Now, it's your opinion that trauma associated with the accident didn't cause the carpal tunnel syndrome to Mrs DiPirro; is that right?

 A. Correct.

 (Item 54, p. 424).

approaching on the roadway to be entered or crossed." N.Y.Veh. & Traf.Law § 1143. This statute imposes an affirmative duty on the operator of a motor vehicle, stopped and about to enter the highway, to "see[ ] what there is to be seen," and yield the right of way to all approaching vehicles. *Grimaldi v. Finch,* 99 A.D.2d 920, 921, 473 N.Y.S.2d 45, 46–47 (3rd Dep't 1984). In addition, the operator of a vehicle proceeding down the roadway has the right to expect that the vehicle entering the roadway from a driveway would comply with the requirements of the statute and yield the right of way. *Id.* (citing 8 N.Y.Jur.2d, Automobiles, § 453, pp. 35–37).

▌ In this case, a fair preponderance of the evidence establishes that Mr. Czuprynski failed to yield the right of way to Mrs. DiPirro when he entered the turning lane from the driveway at 2730 Union Road. Mrs. DiPirro was traveling in the far right-hand lane, about to make a right turn on to William Street as she did every work day. From his right-sided driver's seat in the postal vehicle, Mr. Czuprynski was unable to see her coming. The photographic evidence shows that the postal vehicle struck the Chrysler in the rear, as it was passing the driveway. There was no proof at trial to suggest that Mrs. DiPirro was negligent, or that she caused or in any way contributed to causing the accident. Accordingly, I find that defendant was negligent as a matter of law, and that Mrs. DiPirro was free of any negligence which proximately caused or contributed to the happening of the accident. *Grimaldi, supra: see also Putnam v. Lamoreaux,* 59 A.D.2d 974, 399 N.Y.S.2d 333 (3rd Dep't 1977).

▌ As in any other negligence case, a plaintiff in a Federal Tort Claims Act case must also establish by a preponderance of the credible medical evidence that the injury complained of was causally related to the occurrence. *O'Donnell v. United States,* 1998 WL 603214, at *3 (S.D.N.Y. September 11, 1998); *Aragones v. State,* 247 A.D.2d 657, 668 N.Y.S.2d 772,

773 (3rd Dep't 1998); *Wood v. Hein Trucking Corp.,* 115 A.D.2d 181, 495 N.Y.S.2d 251, 252 (3rd Dep't 1985); *Bugge v. Sweet,* 90 A.D.2d 858, 456 N.Y.S.2d 496, 498 (3rd Dep't 1982), *aff'd,* 61 N.Y.2d 710, 472 N.Y.S.2d 619, 460 N.E.2d 1104 (1984). As discussed above, the evidence presented at trial demonstrates that Mrs. DiPirro's right side injuries were causally related to the August 10, 1994 accident. The proof also demonstrates that Mrs. DiPirro had several preexisting medical conditions and previous traumatic injuries predisposing her to the type of injuries that manifested themselves after the accident. However, the law is well-established that the defendant must take a plaintiff as he or she finds her and hence may be liable for damages for aggravation of a pre-existing illness or for precipitation of a latent condition. *Salas v. United States,* 974 F.Supp. 202, 209 (W.D.N.Y.1997) (citing cases); *see also Martin v. Volvo Cars of North America, Inc.,* 241 A.D.2d 941, 943, 661 N.Y.S.2d 338, 339 (4th Dep't 1997) (negligent defendant is chargeable for all harm caused by negligent act, even if injuries are activated or exacerbated by preexisting vulnerability or condition); *Steinhauser v. Hertz Corp.,* 421 F.2d 1169, 1173 (2d Cir.1970) (while plaintiff's predisposition would not defeat recovery for condition precipitated by accident, it could have significant bearing on amount of damages recoverable).

Accordingly, I find that plaintiffs have met their burden of establishing, by a preponderance of the evidence, that defendant's negligence was a proximate cause of Mrs. DiPirro's injuries.

▌ Even where negligence and causation are present, however, New York's no-fault insurance scheme limits recovery significantly. *Bekiaris v. United States, supra,* 1998 WL 418917, at *6; *see also Zabel v. Olsen,* 895 F.Supp. 44, 46 (N.D.N.Y. 1995). Section 5104(a) of New York Insurance Law provides that:

Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss.

N.Y.INS.LAW § 5104(a). "Basic economic loss" under the statute means up to $50,000 for such items as medical expenses, lost earnings and other reasonable and necessary expenses, up to $25 per day for one year following injury. N.Y.INS.LAW. § 5102(a). Thus, where damages for loss of earnings and medical expenses are less than $50,000, the recovery is zero. N.Y.INS.LAW. § 5102(a)(1), (2); *Ellis v. Johnson Motor Lines, Inc.*, 198 A.D.2d 258, 259, 603 N.Y.S.2d 523, 524 (2nd Dep't 1993).

"Non-economic loss," for which there is a right of recovery only in cases of serious injury, means "pain and suffering and similar non-monetary detriment." *N.Y.Ins. Law* § 5102(c). "Serious injury" means: a personal injury which results in death; dismemberment: significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y.INS.LAW § 5102(d).

■ In this case, defendant claims that plaintiffs have failed to submit proof demonstrating that Mrs. DiPirro incurred medical expenses or lost earnings beyond the basic economic loss covered by the no-fault statute. Defendant also claims that Mrs. DiPirro's injuries do not meet the statute's threshold for "serious injury," thereby precluding recovery for pain and suffering and other non-economic loss.

Plaintiffs have not differentiated between economic loss and non-economic loss with respect to the $400,000.00 demanded in the complaint as damages for Mrs. DiPirro's injuries, and there was no proof offered at trial to establish the exact amounts plaintiffs seek as medical expenses or lost wages. However, Mrs. DiPirro testified that she earned $400.00 per week, or approximately $20,000.00 per year, as manager of Pizza DiPirro, and defendant offered no proof to the contrary. Using as a basis this court's factual finding, set forth above, that Mrs. DiPirro was totally disabled from work between August 10, 1994 and January 5, 1998, I find that plaintiffs' claim for recovery of Mrs. DiPirro's past lost profits alone exceeds $50,000.00.

■ Plaintiffs also seek recovery of non-economic losses suffered as a result of the accident, in the form of damages for Mrs. DiPirro's pain and suffering, and for Mr. DiPirro's loss of support, consortium and services (*see* Item 1). Accordingly, in order to recover such damages under New York's no-fault scheme, plaintiffs must produce sufficient evidence of objective medical findings to demonstrate the existence of "serious injury" by a preponderance of the evidence. *See Scheer v. Koubek,* 70 N.Y.2d 678, 518 N.Y.S.2d 788, 512 N.E.2d 309 (1987).

Based on the evidence presented at trial, I find that Mrs. DiPirro suffered "a medically determined injury or impairment of a non-permanent nature which prevent[ed] her] from performing substantially all of the material acts which constitute [her] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following" the August 10, 1994 accident. N.Y.INS.

LAW § 5102(d); *see O'Donnell v. United States, supra,* 1998 WL 603214, at *1; *Stossel v. Fleyshmahker,* 117 Misc.2d 454, 458 N.Y.S.2d 484, 485 (N.Y.City Civ.Ct. 1983). As discussed above, her treating physicians determined that her neck, back, shoulder, arm, wrist, hand and finger pain was causally related to the accident. The evidence also shows that her injuries prevented her from returning to her manager's job at Pizza DiPirro between August 10, 1994 and January 5, 1998. The evidence also shows that her injuries prevented her from exercising or performing daily household tasks for at least 90 days after the accident.

Accordingly, I find that plaintiffs have established by a preponderance of the evidence that they are entitled to recover for Mrs. DiPirro's economic loss beyond $50,-000.00, and that they are entitled to recover for their non-economic loss, including Mrs. DiPirro's damages for pain and suffering, and Mr. DiPirro's damages for loss of support, consortium and services.

### B. Damages.

 In awarding damages, the trier of fact must be careful to compensate the plaintiff only for injuries attributable to defendant's negligence, and not to compensate for conditions which exist independent of that negligence. *Guerry v. United States,* 1984 WL 1134, at *3 (S.D.N.Y. November 5, 1984). Thus, while both new injuries and aggravation of preexisting ailments attributable to the negligent conduct are compensable, the plaintiff's predisposition to harm based on her preexisting medical condition is a factor to be considered by the court in assessing the reasonableness of the damage award, *id.; see also Steinhauser v. Hertz Corp., supra,* 421 F.2d at 1173 (citing *McCahill v. New York Transp. Co.,* 201 N.Y. 221, 94 N.E. 616 (1911); *Beaudoin v. State,* 24 Misc.2d 962, 207 N.Y.S.2d 348 (N.Y.Ct.Cl.1960)). In addition, under New York law a person who has been injured by reason of a defendant's negligence is

under a duty to use reasonable and proper effort to make the damage as small as practicable, and to act in good faith to adopt reasonable methods to restore herself. *Salas v. United States, supra,* 974 F.Supp. at 211; *Yarrow v. United States,* 309 F.Supp. 922, 932 (S.D.N.Y.1970).

In assessing the amount of damages attributable to defendant's negligence in this case, I find it appropriate to consider Mrs. DiPirro's predisposition to the type of injuries she suffered as a result of the August 10, 1994 accident, based on her preexisting medical conditions and her previous traumatic injuries. I also find it appropriate to consider Mrs. DiPirro's failure to undergo recommended corrective rotator cuff surgery. With these considerations in mind, the court turns to its assessment of reasonable damages recoverable for plaintiffs' economic loss, and for non-economic loss (including pain and suffering and loss of support, consortium and services).

### 1. Economic Loss.

As already discussed, plaintiffs have submitted no proof upon which a determination of past medical expenses attributable to the August 10, 1994 accident can be made. With respect to past lost wages, the proof at trial established that Mrs. DiPirro earned $400.00 per week, or approximately $20,000.00 per year, as manager of Pizza DiPirro. Using as a basis this court's finding, set forth above, that Mrs. DiPirro was totally disabled from work between August 10, 1994 and January 5, 1998, and in the absence of any other proof on the matter, I find that plaintiffs are entitled to recover Mrs. DiPirro's salary for 170 weeks (1994 = 20 weeks; 1995 = 50 weeks; 1996 = 50 weeks; 1997 = 50 weeks; total: $400.00 × 170 weeks = $68,000.00), over and above the $50,000.00 no-fault limit, for a total of $18,000.00.

Because I have found that Mrs. DiPirro was able to return to work as of January 5, 1998, I also find that she is not entitled to

recover future medical expenses or future lost wages.

## 2. Non-economic Loss.

### a. Pain and Suffering.

There is no precise rule for fixing the value of pain and suffering. Instead, the trier of the facts must determine the value from all of the evidence in the particular case. *Yarrow v. United States, supra*, 309 F.Supp. at 932 (citing *Paley v. Brust*, 21 A.D.2d 758, 250 N.Y.S.2d 356 (1st Dep't 1964); *Robison v. Lockridge*, 230 A.D. 389, 244 N.Y.S. 663 (4th Dept. 1930)). Damages for future pain and suffering may be recovered only when it is reasonably certain from the evidence that such damages will necessarily result from the original injury. *Id.* (citing 13 N.Y.JUR. § 534; other citations omitted).

Based on the evidence presented in the case, I find that Mrs. DiPirro is entitled to recover for past pain and suffering due to the injuries proximately caused by defendant's negligence. I also find that her recovery should be reduced by (1) an amount commensurate with the amount of past pain and suffering reasonably attributable to her preexisting ailments and previous traumatic injuries, and (2) an amount commensurate with the amount of past pain and suffering that might have been avoided by having rotator cuff surgery, or by otherwise making a reasonable effort to minimize damages. *See Yarrow v. U.S.*, 309 F.Supp. 922, 932 (S.D.N.Y.1970). In addition, because the evidence shows that she was no longer disabled from work as of January 5, 1998, I find that Mrs. DiPirro is not entitled to recover for future pain and suffering.

Accordingly, in the absence of any credible proof or examples of other pain and suffering verdicts rendered under similar circumstances, I find the amount of $34,000.00 (one-half of Mrs. DiPirro's salary for 170 weeks) to be a reasonable recovery for past pain and suffering.

### b. Loss of Support, Consortium and Services.

Based on the above findings of fact and conclusions of law, I find that Mr. DiPirro is entitled to recover damages for loss of Mrs. DiPirro's support, consortium and services proximately caused by defendant's negligence. The testimony showed that family members helped with household chores during Mrs. DiPirro's period of disability, and no actual expenditures were made for performance of household services. No documentary evidence was submitted to substantiate Mr. DiPirro's contention that his business suffered losses as a result of Mrs. DiPirro's absence from work. Mr. DiPirro conceded that diminishment of sexual relations during this period may have been caused not only by Mrs. DiPirro's injuries but also by Mr. DiPirro's impotence problem.

Accordingly, in the absence of any examples of verdicts rendered under similar circumstances, I find the amount of $2,000.00 to be a reasonable recovery as damages for Mr. DiPirro's loss of support, consortium and services.

## C. Adverse Inference.

The above findings of fact and conclusions of law have been made in light of the adverse inference drawn from plaintiffs' unexplained failure to call Dr. Michael Geraci, the treating physician who conducted electrodiagnostic nerve studies on Mrs. DiPirro's hands, as a trial witness. *Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 275 (2d Cir.1996) (trier of fact may draw adverse inference against party who has power to produce witness "whose testimony would elucidate the transaction," yet fails to call the witness); *see also United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir.1988).

## CONCLUSION

Based on the foregoing, the Clerk of the Court is directed to enter judgment in favor of plaintiffs in the amount of $54,-

000.00 ($18,000.00 for economic loss, plus $34,000.00 for past pain and suffering, plus $2,000.00 for loss of support, consortium and services).

SO ORDERED.